## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BROOKSTONE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10752 (    ) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF JAMES M. SPELTZ IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, James M. Speltz, hereby declare as follows:

1.      I am the President and Chief Executive Officer of Brookstone Company, Inc., a debtor and debtor in possession and the main operating company of the above-captioned debtors and debtors in possession.  As set forth in greater detail below, Brookstone Company, Inc. is a wholly owned subsidiary of Brookstone, Inc., which in turn is wholly owned by Brookstone Holdings Corp. (collectively with the other affiliated debtors, "Brookstone" or the "Debtors").  In this capacity, I am familiar with the Debtors' business, day-to-day operations, and financial affairs.

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court"), and filed various motions described herein requesting certain relief

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Brookstone Holdings Corp. (4638), Brookstone, Inc. (2895), Brookstone Company, Inc. (3478), Brookstone Retail Puerto Rico, Inc. (5552), Brookstone International Holdings, Inc. (8382), Brookstone Purchasing, Inc. (2514), Brookstone Stores, Inc. (2513), Gardeners Eden, Inc. (7793), Brookstone Military Sales, Inc. (2029), Big Blue Audio LLC (N/A), Brookstone Holdings, Inc. (2515); and, Brookstone Properties, Inc. (2517).  The Debtors' corporate headquarters and the mailing address for each Debtor is One Innovation Way, Merrimack, NH 03054.

(collectively, the "First Day Pleadings").  I submit this declaration (the "Declaration") in support of the Debtors' Chapter 11 Cases and the First Day Pleadings.

3.      The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Declaration, the Debtors requested procedural consolidation and joint administration of these Chapter 11 Cases.

4.      Except as otherwise indicated, all statements set forth in this Declaration are based upon (i) my personal knowledge as President and Chief Executive Officer, (ii) information supplied to me by other members of Brookstone management or the Debtors' professionals, (iii) my review of relevant documents, and/or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial affairs.  If called upon to testify, I could and would testify to the facts set forth in this Declaration.  I am authorized by the Debtors to submit this Declaration.

5.      Part I of this Declaration describes the Debtors' business, Part II describes their organizational structure, Part III describes their capital structure, Part IV describes the circumstances giving rise to the commencement of these Chapter 11 Cases, Part V describes the Debtors' proposed course for these Chapter 11 Cases, and Part VI sets forth certain facts in support of the First Day Pleadings.

## I.

## Overview of the Debtors' Business

6.      Brookstone is a highly differentiated, product development company and multi-channel retailer offering an assortment of products that are functional in purpose, distinctive in quality and design, and not widely available from other retailers.  Brookstone strives to provide its customers with innovative "must have" products of superior quality that is unmatched in its

industry.    Since its founding in 1965, Brookstone has developed a fun, interactive in-store shopping experience, combined with the added convenience of shopping by web, catalog, or through strategic partners.

7.    The Brookstone brand was introduced in 1965 by taking out a classified ad in Popular Mechanics Magazine featuring "hard-to-find tools."    In its early days, Brookstone was exclusively a catalog company.    In 1973, Brookstone expanded its business by opening its first retail store in Peterborough, New Hampshire.    The Debtors remain headquartered in nearby Merrimack, New Hampshire.    Brookstone was an early adopter of the internet as a sales and marketing vehicle and in 1996 introduced its website, www.brookstone.com, where it offers thousands of products to consumers, many of which are not available in stores.    Through a combination of Brookstone's (i) selection of unique, trend-right products, (ii) employment of a proprietary, in-house design and engineering team that consistently delivers new product assortments, and (iii) a broad attraction to customer demographic, Brookstone has evolved into one of today's most recognized retail brands, and that brand is one of the Debtors' most valuable assets.

8.    As of February 1, 2014, Brookstone operated 242 retail stores across 40 states and Puerto Rico.    Of those stores, 195 are generally located near "center court" in America's top retail centers and 47 are located in airports.    Certain airport stores are operated as a joint venture between Brookstone Stores, Inc. and one or more third parties.    Joint ventures are organized as limited liability companies.    Depending on the particular market, mall stores vary in size from approximately 2,500 to 3,500 square feet and they carry approximately 700 active stock keeping units (or "SKUs").    In addition to full-year stores, Brookstone operates seasonal stores, which are typically open during the winter holiday selling season and are designed to carry a limited line of

the most popular, gift-oriented merchandise.  Typically, seasonal stores carry between 100 and 175 SKUs.  During the 2013 holiday season, Brookstone operated 63 seasonal stores.

9.      For Fiscal 2013, net sales decreased 7.4% to $481.3 million and comp sales decreased 2.8%, while Adjusted EBITDA decreased 42.2% to $10.7 million (compared to Fiscal 2012).  For the fourth quarter ended December 28, 2013, net sales decreased 8.5% to $213.0 million, comp sales decreased 3.6% and Adjusted EBITDA decreased 14.1% to $30.4 million (compared to the fourth quarter of 2012).

10.      Overall, liquidity decreased in Fiscal 2013 as cash on hand at the end of the year decreased $28.7 million, leaving Brookstone with a balance of $3.3 million outstanding under its revolving credit loan facility.  By contrast, Brookstone had fully paid down its revolving loan balance at the end of Fiscal 2012.  Inventories decreased $2.3 million at the end of Fiscal 2013 as compared to Fiscal 2012, and accounts payable decreased $9.0 million as compared to the end of Fiscal 2012.

A.      **Product Channels and Categories**

11.      Brookstone offers its products through a distribution platform consisting of three main channels:  (i) retail stores; (ii) website, catalog and e-Commerce affiliates; and (iii) wholesale and licensing partners.  Brookstone's traditional retail stores comprise the Retail segment; its website and catalog comprise the e-Commerce segment; and wholesale and licensing comprise the Alternative Distribution segment.

12.      Brookstone sells its products within four main categories:  (i) Technology, which includes audio, mobile solutions, headphones, and digital media; (ii) Wellness, which includes massagers, eComfort, massage chairs, and sleep solutions; (iii) Travel, which includes in-flight comfort, travel lifestyle, and mobile accessories; and (iv) Home, which includes home lifestyle, outdoor, entertainment, and holiday/seasonal.  Brookstone's e-Commerce segment offers all of

these product categories, whereas the mall portion of the Retail segment focuses on Technology and Wellness.    The airport portion of Brookstone's Retail segment focuses on Travel and Technology.

**B.    Marketing**

13.    Brookstone has a multi-channel marketing strategy that maximizes synergies among its distribution channels and cost-effectively presents a unified brand to customers.    For product launches, Brookstone creates a multi-channel marketing strategy that combines best practices in interactive store demonstrations, a content-rich www.brookstone.com website, search marketing, social media events, limited traditional advertising, viral marketing, catalogs, and wholesale distribution.

**C.    Retail Segment**

14.    In the Retail channel, for Fiscal 2013, net sales decreased $36.9 million, or 9.9%, to $335.6 million and same-store sales decreased 4.7% as compared to Fiscal 2012.    For the fourth quarter ended December 28, 2013, net sales in the Retail channel decreased $17.6 million, or 10.9%, to $144.4 million and same-store sales decreased 3.2% as compared to the fourth quarter of 2012.

15.    In Fiscal 2013, Brookstone's Retail segment accounted for approximately 69.7% of net sales, as compared to 71.7% and 75.1% in Fiscal 2012 and 2011 respectively.    The decrease in Retail segment net sales as a percentage of total net sales was driven by the same store sales decrease and by increasing sales in the e-Commerce segment.

16.    Excluding certain overhead allocations, 52% of Fiscal 2013 store profitability was generated from the mall based retail stores and 48% from airport locations.    Wellness and Technology were the principal drivers at mall based retail locations, accounting for 43% and

40% of sales respectively.  Brookstone management believes that retail store EBITDA can be improved an incremental $15 million by the end of Fiscal 2016.

17.     Technology and Travel dominate sales in Brookstone's airport locations, 65% and 27% of sales respectively.  These high-traffic locations, with consistent store traffic patterns and limited seasonality, provide consistent profitability.  Expansion in airports from the current 47 stores to 85 by the end of Fiscal 2016 and the potential of ultimately operating over 200 airport locations represents a substantial opportunity for sales and profitability growth.  In order to capitalize on the strong airport market and expand its ability to successfully bid on additional airport locations, Brookstone intends to launch a new airport format focused on lifestyle essentials for the business and leisure traveler.  This new branding concept will be implemented over time; projected initially for 2 stores in Fiscal 2014, 8 in Fiscal 2015 and 15 in Fiscal 2016.

**D.     E-Commerce Segment**

18.     Since 1996, Brookstone has operated an interactive website at www.brookstone.com.  In addition to offering products available in retail stores and the Brookstone catalog, the website contains thousands of additional items designed to broaden and deepen Brookstone's presence in key product categories.  The "web-only" assortment accounted for approximately 30% of Brookstone's e-Commerce sales for Fiscal 2013.  Brookstone is continuously adding new SKUs to its website, and had over 58,000 SKUs available for customers to purchase as of December 29, 2012, and 72,000 SKUs as of December 28, 2013.  Brookstone has also increased its web presence and interactivity through marketing initiatives and promotions on Facebook, Twitter, Pinterest, FourSquare, and through other viral marketing strategies.  In Fiscal 2012, Brookstone launched its first "tablet" website t.brookstone.com, and re-launched its mobile website m.brookstone.com.  In the future, Brookstone anticipates that its

e-Commerce strategies will serve an increasingly important role in its integrated multi-channel strategy.

19.    The Brookstone catalog offers a highly focused selection of merchandise available in Brookstone's retail stores and website.   The largest mailings of the Brookstone catalog occur immediately before Father's Day and during the November and December holiday season, which coincide with Brookstone's two busiest selling periods.   The catalog is mailed to people with demographic profiles matching those of Brookstone's traditional customers.

20.    Indeed, the Brookstone catalog and website, www.Brookstone.com, are the primary drivers for e-Commerce sales.   Each of the catalog and website not only serves as a marketing vehicle for online sales, but also in-store sales.   A review of the financial impact of the catalog reveals that it is a profitable multi-channel advertising and sale generation vehicle. Circulation cuts since Fiscal 2008 have significantly impacted sales, by approximately $20 million in Fiscal 2013.   Return on investment in catalog spending is realized in a matter of weeks and positively impacts purchase frequency.   Additional demand and margin driven by catalog mailings offsets the expense of production, mailing and fulfillment.   Significant growth opportunities to scale the catalog's impact and drive increased sales exist within Brookstone's household database and externally from customer prospects who Brookstone has identified through demographic research.

21.    In Fiscal 2013, on-line demand, from Brookstone's tablet and mobile device optimized website increased 22%.   Thirty percent (30%) of Brookstone's e-Commerce sales delivered in drop shipments eliminating the need to handle and store that merchandise.   Fiscal 2014 January catalog statistics indicate that with increased circulation over the same period in Fiscal 2013, demand is up 46% and variable profit is up 125%.   These improvements can be

attributed to the greater volume of catalogs mailed, enhanced customer modeling, refined customer segmentation and selection, improved merchandising mix and increased page density. The catalog is critical to driving visits to the Brookstone website homepage where approximately 5.2% of visitors made a purchase in Fiscal 2013, compared to only 0.6% of mobile visitors. The Debtors believe that Fiscal 2013 catalog reductions led to a 12% decrease in visits to the Brookstone.com homepage.

22.     In addition to catalog driven sales, online marketing fuels e-Commerce growth. Brookstone's continued strategic investment in online marketing is necessary to continue the growth in web traffic and demand with increased speed and efficiency. This process is complex and data-driven. Core competencies in the four major sources of e-Commerce: Search, Affiliates, Third Party Marketplaces and e-Mail are critical to success.

23.     Overall, net sales in the e-Commerce channel increased $3.5 million or 3.3% to $108.9 million for Fiscal 2013, as compared to Fiscal 2012. For the fourth quarter ended December 28, 2013, net sales in the e-Commerce channel decreased $1.0 million, or 1.6%, to $59.1 million as compared to the fourth quarter of fiscal 2012.

24.     In Fiscal 2013, Brookstone's e-Commerce segment accounted for approximately 22.6 % of net sales, as compared to 20.3% and 19.7% in Fiscal 2012 and 2011 respectively. The increase in e-Commerce segment net sales as a percentage of total net sales was primarily the result of continuing growth of online marketing, search engine optimization, and partnership programs.

E.      **Alternative Distribution Segment**

25.      Since 2007, Brookstone has sought to capitalize on wholesale partnerships in its Alternative Distribution segment.   Brookstone's Alternative Distribution segment primarily includes sales of products to select resellers and corporate partners.

26.      The Debtors believe that their unique product offerings, price stability and limited distribution entice retailers to partner with Brookstone and carry Brookstone products.   As a result, these partnerships have led to growing marketshare, positive EBITDA contribution and increased brand awareness without detracting from Brookstone's other segments.   During the period between Fiscal 2009 and Fiscal 2013, the Debtors have realized a 51.4% compound annual growth rate in this segment.   Of the $36.5 million in sales in Fiscal 2013, pillows and bedding (31%), comfort and massage (17%) and audio and technology (17%) were the principal drivers in this segment.   Wine and food (11%) and mobile technology (10%) were significant contributors as well.

27.      This external presence increases awareness of the Brookstone brand and its products.   As awareness grows and strengthens, demand for Brookstone's products from wholesale partners increases.   This expanding awareness also drives consumers to the Brookstone website and stores.

28.      Significant opportunity for growth, including through licensing the Brookstone trademarks, exists in the Alternative Distribution segment.   In order to capitalize on these opportunities, however, substantial capital investment in the Brookstone platform and operations will be required.   The Debtors anticipate that licensing arrangements, leveraging external resources to finance inventory, sales and logistics and refocusing internal resources will be key

avenues to achieving success in the Alternative Distribution segment.  Attention to Brookstone's operating assets and procedures will be required to support all improvement initiatives.

29.     For Fiscal 2013, net sales in the Alternative Distribution channel, which includes the wholesale business, decreased $4.8 million or 11.6% to $36.8 million as compared to Fiscal 2012.  For the fourth quarter ended December 28, 2013, net sales in the Alternative Distribution channel decreased $1.2 million or 11.5% to $9.5 million as compared to the fourth quarter of Fiscal 2012.

30.     In Fiscal 2013, Brookstone's Alternative Distribution segment accounted for approximately 7.7% of net sales, as compared to 8.0% and 5.5% in Fiscal 2012 and 2011 respectively.  The decrease in the Alternative Distribution segment net sales as a percentage of total net sales for Fiscal 2013 as compared to Fiscal 2012 was primarily the result of the Company's focus on profitable go forward wholesale customers.

F.     **Product Sourcing**

31.     A significant portion of the Debtors' sales are generated from Brookstone-branded products that are developed in New Hampshire and sourced internationally through a network of third-party manufacturers and vendors.  Approximately two-thirds of the products sold are proprietary Brookstone products.  The other one-third is sourced from third parties.

32.     Brookstone's sourcing capabilities are diverse and flexible with a vendor network of over 1,000 partners, of which approximately 170 are in Asia.  Brookstone's largest partner is comprised of a network of over 150 factories.  This partner also manages product development, sourcing and quality assurance functions.  No one factory in this partner's consortium represents more than 4% of total purchases.  The top 25 factories in this vendor group represent approximately 30% of Brookstone purchases.  These sourcing resources respond to Brookstone's

centralized merchandising and planning function that allocates purchases between third party and proprietary goods.

33.      Brookstone employs merchandise professionals who pursue new products that differentiate it in the marketplace and that meet Brookstone's quality and profitability standards.  These professionals also travel worldwide visiting trade shows, manufacturers, and inventors in search of new and innovative products.  Brookstone's merchandise directors develop relationships with third party manufacturers and coordinate with sourcing and quality control teams in Asia.

34.      Brookstone's sourcing network allows it to monitor and maintain quality standards throughout the development and manufacturing process and provides it with the flexibility to match manufacturing capacity with demand.  Brookstone Labs, Brookstone's in-house engineering and design group, based at its corporate headquarters in Merrimack, New Hampshire, helps translate the strategies of Brookstone's merchandising professionals into a consistent and unique design esthetic.  Through these efforts, Brookstone has obtained numerous utility and design patents and owns the manufacturing molds for most Brookstone-branded products.  The Debtors believe that selling Brookstone-branded products reinforces its franchise value and generates and strengthens customer loyalty.  The patents and trademarks for these proprietary products are an important asset of Brookstone.

35.      Although Brookstone will need to invest in additional distribution assets to carry out its improvement plan, Brookstone's current distribution and customer care center contains sophisticated material handling equipment facilitating the shipment of up to 60,000 packages daily.  This capacity supplements the e-Commerce drop ships mentioned previously.  The

customer care center includes a 130 seat call center that handles customer service needs for all of Brookstone's channels.

**G.      Corporate Headquarters and Distribution Center**

36.      Brookstone owns its corporate headquarters located in Merrimack, New Hampshire.  Brookstone also operates a single distribution center in Mexico, Missouri (the "Distribution Center") that is approximately 400,000 square feet and, as needed, leases additional warehouse offsite space at locations throughout the country.  Brookstone receives and distributes nearly all its inventory through its Distribution Center, which supports the Retail, e-Commerce, and Alternative Distribution segments.  Brookstone seeks to maintain an  inventory of products in its Distribution Center that ensures a sufficient supply for sale to customers.   Distributions to retail stores are made, at a minimum, on a weekly basis predominantly through United Parcel Service ("UPS") shipments. Distributions to e-Commerce customers are made daily, predominantly through UPS.  Additionally, a number of products are "drop-shipped" or shipped directly to customers by vendors.

37.      Under the operating agreements governing airport store joint ventures, the Debtors retain title to the inventory located in each store.  Members enjoy a percentage interest in the profits generated by operation of each joint venture location.

## II.

## Organizational Structure

38.      Brookstone Holdings Corp. and Brookstone, Inc. are both incorporated in Delaware and are holding companies, the principal asset of which is the capital stock of Brookstone Company, Inc., a New Hampshire corporation that, along with its direct and indirect subsidiaries, operates the Debtors' businesses.  Brookstone is a privately held, indirect wholly-owned subsidiary of OSIM Brookstone Holdings, L.P. ("OBH LP"), the general partner of which

is OSIM Brookstone Holdings, Inc., ("OBH GP").  OBH LP's limited partners include OSIM International, Ltd. ("OSIM"), affiliates of J.W. Childs Equity Partners III, L.P. ("JWC"), and Century Private Equity Holdings (S) Pte Ltd. ("Temasek").

39.    A chart detailing the Debtors' corporate structure is attached hereto as **Exhibit A**.

### III.

### Capital Structure

40.    The chart below sets forth the Debtors' funded debt obligations as of the Petition Date:

| Debt Obligation | Original Amount | Approximate Amount Outstanding as of Petition Date | Maturity | Security Status |
|---|---|---|---|---|
| Senior Secured Prepetition Credit Facility | $110.0 million (Revolver) $12.3 million (Term Loan) | $34.1 million (Revolver) $12.3 million (Term Loan) $4.7 million (Letters of Credit) | 12/30/2016 or 105 days before maturity of Second Lien Note | Secured |
| Junior Prepetition Notes | $126.5 million | $137.3 million | 10/15/2014 | Secured |

A.    **Senior Secured Prepetition Credit Facility**

41.    Brookstone Company, Inc., as lead borrower, and Wells Fargo Bank, National Association, as administrative agent, collateral agent, and term loan agent (the "Credit Facility Agent"), and certain lenders are parties to an Amended and Restated Credit Agreement, dated as of August 13, 2013 (as amended, modified, supplemented, or restated from time to time, the "Senior Secured Credit Facility" or "Prepetition Credit Facility").  Each of the other Debtors guaranteed the obligations under the Senior Secured Credit Facility.  The Senior Secured Credit

Facility is comprised of a $110.0 million revolving credit facility (the "<u>Revolver</u>") and a term loan with the original value of $20.0 million (the "<u>Term Loan</u>").

42.     The Senior Secured Credit Facility obligations are secured by first priority liens on substantially all of the Debtors' assets, including receivables, inventory, general intangibles, intellectual property, documents, deposit accounts, equipment, fixtures, inventory, and intellectual property, all as set forth in the Security Agreement, dated as of December 30, 2011, by and among the Debtors and the Credit Facility Agent.  The Senior Secured Credit Facility is further secured by a first mortgage on the Debtors' corporate headquarters property in Merrimack, New Hampshire.

**B.     <u>Second Lien Notes</u>**

43.     Brookstone Company, Inc. issued 13.00% Second Lien Senior Secured Notes due 2014 (the "<u>Second Lien Notes</u>" or "<u>Prepetition Notes</u>") pursuant to the Indenture, dated as of October 26, 2010, by and among the Debtors and Wilmington Trust, National Association, as successor to Wells Fargo Bank, National Association, indenture trustee (the "<u>Indenture Trustee</u>").  The other Debtors guaranteed the Second Lien Notes.  As of the Petition Date, $137.3 million of Second Lien Notes is outstanding.  The Second Lien Notes are secured by second priority liens on substantially the same assets as the Senior Secured Credit Facility, however, the collateral securing the Second Lien Notes does not include the Debtors' interests in owned or leased real estate.

**C     <u>Intercreditor Agreement</u>**

44.     Brookstone Company, Inc., the Indenture Trustee, and Bank of America, N.A., as priority lien collateral agent, entered into an Intercreditor Agreement on October 26, 2010 that,

among other things, governs the relative priorities of liens granted under the Senior Secured Credit Facility and Second Lien Notes, respectively.

**D**      **Unsecured Debt**

45.      As of the Petition Date, the Debtors estimate that their unsecured debt is between $75 to $85 million, consisting of accounts payable (approximately $5.6 million) to vendors, accrued but unpaid expenses (approximately $5.5 million), and the Second Lien Notes' deficiency claim which is in the range of 70-80% of the total unsecured debt.[2]

**E.**      **Equity**

46.      Brookstone Holdings Corp. is owned by OBH LP, a Cayman Islands limited partnership, the general partner of which is OBH GP.  The limited partners of OBH LP consist of OSIM, JWC, Temasek and numerous current and former Brookstone employees.

**IV.**

**Events Leading to These Chapter 11 Cases**

47.      In 2005, Brookstone was acquired by a consortium of investors including JWC, OSIM and Temasek.  At its peak in 2007, Brookstone generated net sales of $563 million and adjusted EBITDA of $59 million, representing an adjusted EBITDA margin of 11%.  The tepid pace of economic recovery following the Great Recession, however, has hampered the Debtors' efforts to restore its performance to pre-recession levels.  In Fiscal 2013, the Debtors' adjusted EBITDA was $ 10.7 million.   The chart below shows the Debtors' historical financial performance:

---

[2] The amount of the deficiency claim is subject to change depending on numerous factors.

### Historical Net Sales and EBITDA



Note: Figures based on internal financials.  Please refer to page 95 for a reconciliation between the Company's internal financials and its external, audited financials.
(1) Includes three outlet stores.
(2) Reflects same store sales for brick & mortar retail locations.
(3) Reflects same store sales inclusive of brick & mortar retail locations and direct-to-consumer.

48.    Brookstone entered the economic downturn with a highly levered capital structure, and in an attempt to navigate the challenging environment, undertook a number of strategic initiatives to improve its cost structure, aimed primarily at boosting short-term performance and liquidity.  This effort included, eliminating unprofitable stores, reducing overhead, streamlining product development, and cutting investment into marketing/customer acquisition.  These cuts in investment included a 50% cut in catalog circulation, which negatively impacted revenues in a significant way.  When combined with a 60% decrease in capital spending, Brookstone's stores became dated, a void was created in new merchandising, and its customer base was weakened.  In addition, Brookstone has employed seven different Chief Executive Officers and four different Chairmen over the past seven years, resulting in inconsistent leadership and lack of a long-term strategic plan.

49.    In 2010, the Debtor sought to de-lever its balance sheet through an exchange of its Second Lien Notes.  Under the 2010 exchange, holders of second lien notes issued in 2005 were offered a combination of cash (invested by Brookstone shareholders) and new Second Lien

Notes.  As a result of the 2010 exchange, and Brookstone's subsequent repurchase of outstanding 2012 second lien notes in 2011, the outstanding principal amount of Brookstone's noteholder debt decreased from approximately $170,000,000 to $126,500,000; however, the interest rate payable on Brookstone's Second Lien Notes increased from 12% to 13% annually.

50.    More recently, in Fiscal 2013, the Debtors implemented several cost cutting programs in an effort to save approximately $25.8 million in annual expenses.  For example, the Debtors eliminated 121 staff positions saving approximately $11.5 million, and reduced additional overhead through store closings.  The Debtors also began re-establishing long-term growth initiatives by investing in store productivity training and modestly increasing catalog circulation.  Despite these and other efforts, Brookstone was unable to increase revenues and generate net income in amounts necessary to satisfy looming debt maturities.

51.    By the end of December 2013, it became clear to the Debtors that holiday sales would be substantially less than expected and that EBITDA would also be disappointing.  Faced with a looming interest payment on the Second Lien Notes (i.e. January 15, 2014), and the maturity of the Second Lien Notes in October 2014, the Debtors engaged legal and financial advisors and began restructuring discussions with their creditors.  More specifically, the Debtors (a) retained Jefferies LLC ("Jefferies") as their investment banker and Deloitte Transactions and Business Analytics LLP ("Deloitte") as their financial advisor, and (b) formed a three member sub-committee of the Debtors' board of directors (the "Sub-Committee") to evaluate, monitor and oversee the Debtors' efforts to restructure or reorganize.

52.    Following approval by the full board of directors on January 9, 2014, Brookstone embarked on a "dual track" strategy whereby they would pursue a traditional effort to market Brookstone's businesses for sale, while simultaneously engaging in discussions with holders of

Second Lien Notes concerning the possibility of a balance sheet restructuring (either in or outside of bankruptcy).   Led by a team of investment bankers from Jefferies, Brookstone embarked on a comprehensive marketing process for the sale of the Debtors' business or financial restructuring of the Debtors.   The Debtors and their Senior Secured Lender, Wells Fargo subsequently entered into a written Forbearance Agreement, whereby the Bank agreed to forbear from taking collection action or exercising its rights in the Debtors' assets through March 15, 2014, affording the Debtors a short but meaningful amount of time to evaluate their restructuring alternatives.   That agreement was thereafter extended through April 2, 2014.

53.   During the sale marketing process, Jefferies contacted a total of 158 parties, of which 65 were strategic and 93 were financial prospects.   Of those contacted, 53 signed confidentiality agreements and were granted access to an electronic dataroom containing approximately 1,871 documents (representing 42,090 pages) regarding the business and financial condition of the Debtors, including certain material non-public information.   The initial marketing process ended on February 10, by which time Brookstone had received eight (8) non-binding initial indications of interest ranging in value from $75 to $110 million.   Interested parties included a mix of strategic and financial buyers that proposed varying deal concepts and structures.   The Debtors invited four (4) of the eight (8) bidders to continue into a second round of the sale process during which they were asked to complete their diligence and to make a formal purchase offer by March 5, 2014.   Ultimately, the Debtors received formal offers from three (3) of the four (4) potential bidders.   These second round bids were received from strategic and financial bidders alike and proposed varying deal structures, with estimated values ranging from a low of $83 million to a high of $123 million, subject to various adjustments.

54.     Simultaneously with the sale process, Brookstone began negotiating with an ad hoc group (the "Ad Hoc Committee") of Second Lien Note holders.  Discussions between the Debtors and the Ad Hoc Committee began in January, continued through February, and intensified in March.  The Ad Hoc Committee also began exploring the possibility of acquiring Brookstone through either a debt to equity exchange in a plan of reorganization or through a credit bid for all assets in a sale under Section 363 of the Bankruptcy Code.

55.     The Ad Hoc Committee proposed a comprehensive restructuring whereby Wells Fargo Credit Facility would be refinanced through (i) a debtor-in-possession loan to be made by a group of the holders of the Second Lien Notes ("Second Lien Noteholders" or "Prepetition Noteholders") and (ii) the conversion of all Second Lien Notes into 100% of Brookstone's equity under a Chapter 11 plan of reorganization.  After thoroughly evaluating each of the four alternative proposals, the Debtors' board of directors concluded that the proposal made by the Ad Hoc Committee represented the highest and best offer to acquire the companies.  Following a meeting of the Debtors' board of directors, management and the Debtors' professionals were authorized to commence negotiations with representatives of the Ad Hoc Committee with the objective of finalizing definitive agreements, pleadings and other documents by March 15, or as soon thereafter as was practicable.

56.     During the course of the Debtors' negotiations with the Ad Hoc Committee, one of the second round bidders, SPB Acquisition LLC ("SPB") an affiliate of Spencer Spirit Holdings, Inc. ("Spencer") substantially improved its March 5 offer, but conditioned its new proposal on its ability to complete further due diligence.  After consulting with the Ad Hoc Committee, Brookstone agreed to allow SPB to conclude its additional diligence, even while the

Ad Hoc Committee and the Debtors continued their efforts to finalize agreements concerning a Chapter 11 plan and financing therefor.

57.    After further extensive and good faith negotiations among the Debtors, SPB and the Ad Hoc Committee, the parties reached agreement on the terms of a Chapter 11 plan of reorganization.  In summary, SPB has agreed, subject to the terms and conditions of the Restructuring Transaction Agreements (as defined below), to sponsor a Chapter 11 plan supported by the Prepetition Noteholders whereby SPB will acquire 100% of the newly issued shares of stock of reorganized Brookstone Holdings Corp. (the "Shares") for $120 million in cash plus the additional consideration as set forth in the SPA (as defined below) that in the aggregate the Debtors estimate could be worth up to approximately $146,265,000 million (the "Purchase Price").  To ensure that maximum value for the Shares is achieved, notwithstanding the extensive pre-petition marketing efforts, the right to serve as plan sponsor will be market tested through a competitive auction process to be approved by this Court.  To induce SPB to serve as a stalking horse for a plan sponsorship auction, the Debtors' have agreed, subject to this Court's approval to certain "bidder protections" including a break-up fee of $3.7 million and an expense reimbursement of $500,000.

58.    The proposal made by SPB is the highest and best offer received by the Debtors. SPB is a highly reputable, experienced and financially sound specialty retailer focused on providing a fun and engaging retail experience through two principal formats Spencer's and Spirit.  Spencer's is a mall-based specialty retailer targeting the 18 to 24 year old demographic, with a distinctive and fun mix of products offered in over 640 stores in the U.S. and Canada. Spirit is a seasonal, "category killer," Halloween retailer with over 1,000 stores in the U.S. and

Canada. Spencer has an over 65-year history of bringing distinctive and exciting products to its customers, and continues to be a pioneer in the retail industry.

59. The sale of the Shares to SPB, who will operate the Brookstone chain as a going concern, will preserve jobs for most of Brookstone's full and part time employees. This acquisition will also preserve relationships with landlords and vendors and will rejuvenate the Debtors both financially and operationally.

## V.

## Proposed Course of Chapter 11 Cases

60. Following a Board of Directors meeting on Saturday, March 29, the Debtors entered into a Restructuring Support Agreement (the "Restructuring Agreement") with certain holders of the Second Lien Notes (the "Consenting Noteholders"). Pursuant to the Restructuring Agreement, the Debtors agreed, among other things, to (a) commence these Chapter 11 Cases; (b) obtain approval for the DIP Facility, and (c) prosecute, obtain confirmation of and implement a plan of reorganization which shall be consistent in all material respects with the terms and conditions of the Restructuring Support Agreement, and the Plan Term Sheet.

61. In addition, the Debtors have entered into two agreements with SPB: (a) a Plan Sponsorship Agreement (the "PSA"); and (b) a Stock Purchase Agreement (the "SPA") (together, the "Spencer Agreements"). Under the plan contemplated by and subject to the terms and conditions set forth in the Spencer Agreements, the Plan Term Sheet and the Restructuring Agreement (collectively, the "Restructuring Transaction Agreements"), SPB will acquire the Shares for the Purchase Price. The Restructuring Agreement and Spencer Agreements contemplate, among other things, the filing of a Chapter 11 plan within 20 days after the Petition Date.

62.     The Spencer Agreements and Restructuring Agreements further contemplate competitive bidding and an auction process for the right to serve as plan sponsor.  The Bidding Procedures are set forth in detail in **Annex 1** of the *Order Granting Motion of the Debtors for Entry of an Order (a) Authorizing the Debtors to Assume the Plan Sponsorship Agreement; (b) Approving Bidding Procedures in Connection with an Auction for Plan Sponsorship; (c) Approving Certain Stalking Horse Protections; and (d) Authorizing and Scheduling a Date and Time for an Auction Pursuant to Such Procedures*, filed on the date hereof.  The Bidding Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence by prospective bidders, the deadline and requirements for submitting a bid, the method and criteria for bids to become "qualified," the manner in which qualified bids will be negotiated, clarified, and improved, and the criteria for selecting a winning bidder, including if necessary, through a public auction.

63.     With respect to post-petition financings, the Debtors actively solicited proposals from more than twenty (20) lenders and other financial institutions.  Of those parties contacted by Jefferies, twelve (12) parties requested non-disclosure agreements, five (5) parties signed such agreements and conducted due diligence.  Ultimately, four (4) DIP financing proposals were received, including proposals from Wells Fargo and the Ad Hoc Committee.  Although certain aspects of the DIP financing proposal made by the Ad Hoc Committee was more expensive than the proposal made by Wells Fargo (but were otherwise more favorable and less expensive than the other two proposals), the Ad Hoc Committee's proposal is an integral component of, and foundation for, the plan sponsored by SPB which plan has formal support from more than two-thirds of the Second Lien Noteholders.  Facilitating a comprehensive restructuring of the Debtors

was a feature that no other DIP Lender could offer.  For that reason, the Debtors submit that they were unable to obtain financing on more favorable terms from sources other than the DIP Lenders, and that without such financing, the Debtors' ability to successfully consummate a reorganization would be jeopardized.

## VI.

## Facts in Support of First Day Pleadings[3]

64.     In connection with their Chapter 11 Petitions, the Debtors have filed a number of First Day Pleadings seeking various forms of relief.  To the extent that they were not otherwise addressed above, the facts underlying the First Day Motions are stated below.

**A.      Motion of the Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases**

65.     Contemporaneously with the filing of this Declaration, the Debtors have also filed a *Motion of the Debtors for Entry of an Order Directing the Joint Administration of Related Chapter 11 Cases*, by which they seek that the Chapter 11 Cases of all Debtors be administered jointly.

66.     In these cases, all Debtors are affiliated.  Brookstone Properties, Inc., and Big Blue Audio LLC are wholly-owned subsidiaries of Brookstone Holdings, Inc, and Brookstone Holdings, Inc. is a wholly-owned subsidiary of Brookstone Stores, Inc.; and Brookstone Stores, Inc. is a wholly-owned subsidiary of Brookstone Company, Inc.  Additionally, the other Debtors are all wholly-owned subsidiaries of Brookstone Company, Inc., which include:  Brookstone Retail Puerto Rico, Inc., Brookstone International Holdings, Inc., Brookstone Purchasing, Inc., Gardeners Eden, Inc., and Brookstone Military Sales, Inc.

---

[3] Capitalized terms not defined within this Section VI shall have the meaning ascribed to such terms in the respective First Day Motions.

**B.      Application of the Debtors for Entry of an Order Appointing Kurtzman Carson Consultants, LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date AND**
**Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Administrative Agent for the Debtors Nunc Pro Tunc to the Petition Date**

67.      Contemporaneously with the filing of this Declaration, the Debtors have also filed an *Application of the Debtors for Entry of an Order Appointing Kurtzman Carson Consultants, LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* (the "Section 156(c) Application") and an *Application of the Debtors for Entry of an Order Approving the Employment and Retention of Kurtzman Carson Consultants LLC as Administrative Agent for the Debtors Nunc Pro Tunc to the Petition Date* (the "Section 327 Application").

68.      On March 27, 2014, Brookstone entered into an agreement with Kurtzman Carson Consultants ("KCC"), whereby the latter would provide certain services in connection with claims and notices to be provided in these Chapter 11 Cases, as well as other administrative services (the "Services Agreement"), a true and accurate copy of which is attached as **Exhibit B** to the Section 156(c) Application and the Section 327 Application.

69.      The Debtors retained KCC because it is one of the nation's leading chapter 11 administrators, with extensive experience in claims and notice processing.  I understand that KCC has developed efficient and cost-effective methods to handle properly the voluminous mailings associated with the claims and noticing portions of chapter 11 cases to ensure the orderly and fair treatment of all stakeholders.

70.      I have also been informed, as also reflected in the *Declaration of Evan Gershbein in Support of Application of the Debtors for Entry of an Order Appointing Kurtzman Carson Consultants, LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* (the "Gershbein Declaration"), that KCC is a disinterested entity and has no conflict of interests that

would affect its impartiality in performing its duties and obligations under the Services Agreement.

**C.**      **Motion of the Debtors for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System, (C) Granting Administrative Expense Status to Postpetition Intercompany Claims and (D) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(B)**

71.      Contemporaneously with the filing of this Declaration, the Debtors have also filed a *Motion of the Debtors for Entry of an Order (a) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (b) Authorizing the Continued Use of Existing Cash Management System, (c) Granting Administrative Expense Status to Postpetition Intercompany Claims and Granting Limited Relief From the Requirements of Bankruptcy Code Section 345(b).*

**i.**      **The Debtors' Cash Management System**

72.      Prior to the commencement of these Chapter 11 Cases, and in the ordinary course of their businesses, the Debtors maintained a centralized  cash management system (the "Cash Management System"), a diagram of which has been attached as **Exhibit 1** to the motion, and associated procedures to efficiently collect, transfer, and disburse funds generated by the Debtors' retail operations.  The Cash Management System has been in place for many years and ensures the Debtors' ability to efficiently monitor and control their cash position.

73.      The Cash Management System has several key components:  (a) cash collection from deposit of cash and check payments made by the Debtors' retail customers into a store depository account; (b) cash concentration from those store depository accounts into a master operating account; and (c) cash disbursements to fund the Debtors' operations from specialized

accounts maintained for the payroll, expense, merchandise disbursement, and customer disbursements.

74.    The Cash Management System contains an integrated network of hundreds of bank accounts maintained at approximately fifty-eight (58) separate banks (collectively, the "Bank Accounts").  Due to the Debtors' extensive retail operations, the majority of the Bank Accounts are individual store bank accounts (the "Store Deposit Accounts"), which are depository accounts associated with each of the Debtors' 242 operating retail locations.  Store Deposit Accounts at Wells Fargo, Bank of America ("BofA"), and HSBC Bank USA, N.A. ("HSBC") are aggregated into intermediary accounts at each bank (the "Intermediary Accounts").  Proceeds from mail order catalogue sales are deposited into a direct marketing account (the "Direct Marketing Account").  On a daily basis in some cases, and twice a week in others, the funds collected by the Store Deposit, Intermediary, and Direct Marketing Accounts are in turn transferred into a primary depository account (the "Primary Depository Account").  In addition, credit card receipts from the Debtors' credit card processors flow directly into the Primary Depository Account.

75.    There are also eleven (11) corporate accounts (the "Corporate Bank Accounts") through which cash is concentrated and disbursements are made.  The Corporate Bank Accounts consist of three (3) intermediary accounts, which concentrate deposits from certain Store Deposit Accounts, a direct marketing account, a primary depository account, into which all store and direct marketing deposits are transferred, a master operating account, a controlled disbursement account, a payroll account, a postage/petty cash account, and a medical spending account.

76.    Prior to the Petition Date, and pursuant to the terms of the Revolving Credit Facility, Wells Fargo swept the Primary Deposit Account on a daily basis to repay amounts

outstanding under the Revolving Credit Facility.  Wells Fargo then re-advanced funds to the Debtors to a master operating account (the "Master Operating Account") as needed to fund operations based on the Debtors' borrowing requests.  After Wells Fargo advanced funds into the Master Operating Account, the Debtors then funded various special purpose disbursement accounts to fund their operations and obligations, on account of (a) expenses, (b) payroll, (c) medical, and (d) petty cash.

77.     The Debtors' Cash Management System is an essential business practice that was created and implemented in the exercise of the Debtors' business judgment.  The Cash Management System is similar to those commonly employed by retail chains comparable to the Debtors' size and complex operations.

### ii.     The Debtors' Existing Forms

78.     In the ordinary course of business, the Debtors use blank check stock with the Debtors' logo printed thereon.  System-generated sequenced check numbers are printed on stock as checks are printed.  In addition, the Debtors maintain pre-printed correspondence and Business Forms.

### iii.     The Debtors' Intercompany Transactions

79.     While the Debtors maintain a centralized Cash Management System, they account for obligations that arise among each other via their business and legal relationships (the "Intercompany Transactions") through book entries on the Debtors' books and records.

80.     The Debtors maintain records of the Intercompany Transactions, including fund transfers, and thus can ascertain, trace and account for Intercompany Transactions.  The Debtors reconcile all Intercompany Transactions monthly.  The Debtors will continue to maintain records and appropriately reconcile all Intercompany Transactions postpetition.

D.   **Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Obligations**

81.     Contemporaneously with the filing of this Declaration, the Debtors also filed a *Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Related Obligations*.

82.     In the ordinary course of business, the Debtors incur various sales, use, income, trust fund, transfer, franchise, real property, and personal property taxes, as well as certain local taxes on gross receipts, business license fees, and other taxes and similar obligations (collectively, the "Taxes") to certain taxing authorities (the "Taxing Authorities").   A non-exhaustive list of the Taxing Authorities to which the Debtors pay Taxes is attached as **Exhibit 1** to the motion.

   **i.     Sales and Use Taxes**

83.     For each in-store and online sale, the Debtors collect a variety of sales, local gross receipt, and other similar taxes (the "Sales Taxes") from their customers on behalf of the Taxing Authorities, and periodically remit the Sales Taxes to the Taxing Authorities.

84.     Normally, Sales Taxes accrue as the Debtors sell merchandise and are calculated on the basis of statutorily mandated percentages of the price at which the Debtors' merchandise is sold.   In some cases, Sales Taxes are paid in arrears once collected by the Debtors.  Sales Taxes are remitted to the Taxing Authorities either on the basis of estimated Sales Tax collections for the coming period, or on the basis of Sales Taxes actually collected from customers, depending on the method required by the Taxing Authorities, but generally, the Debtors pay significant Sales Taxes monthly.   In an average month, the Debtors remit

approximately $2,653,000.00 in Sales Taxes to the Taxing Authorities.[4]  The Debtors estimate that approximately $1,855,300.00 in Sales Taxes were payable as of the Petition Date.

85.    The Debtors also incur use taxes (the "Use Taxes") in connection with the purchase of certain tangible personal property or services from vendors that have no nexus to states where the Debtors operate.  In these circumstances, such vendors are not obligated to charge or remit Sales Taxes.  Nevertheless, under the various state laws governing Use Taxes, certain of the Debtors, as purchasers, are obligated to self-assess and pay the Use Taxes when applicable.  Certain of the Debtors pay Use Taxes in arrears and the timing and payment of Use Taxes varies from jurisdiction to jurisdiction, but in most cases, the applicable Debtor remits the Use Taxes to the Taxing Authorities monthly.  In an average month, the Debtors remit approximately $23,000.00 (net of refunds) in Use Taxes to the Taxing Authorities.  The Debtors estimate approximately $408,300.00 in Use Taxes were payable as of the Petition Date.

### ii.    State and Local Income Taxes and Franchise Taxes

86.    Certain of the Debtors also are required to pay state and local income, franchise, and similar taxes in certain jurisdictions (the "Franchise and Income Taxes"). Franchise taxes are generally assessed by state and local Taxing Authorities against the applicable Debtor for the privilege of doing business within a particular jurisdiction.  Franchise taxes may be based on a flat fee, net operating income, gross receipts, or capital employed. Certain states will refuse to qualify a debtor to do business in a state if franchise taxes have not been paid.  Most jurisdictions assess franchise taxes on an annual basis, in arrears, but some jurisdictions require estimated franchise taxes to be remitted quarterly if the estimated franchise taxes exceed a certain threshold.  Moreover, certain jurisdictions assess both franchise taxes and

---

[4] This figure represents the average monthly amount paid on an annualized basis.  In December, the amount paid in Sales Taxes was approximately $9 million.

income taxes, while others assess either franchise taxes or income taxes depending on which results in the higher tax.

87.     In their last fiscal year, the Debtors remitted approximately $460,000.00 to the Taxing Authorities for Franchise and Income Taxes.  The Debtors estimate that approximately $185,000.00 in Franchise and Income Taxes is payable as of the Petition Date.

### iii.     Real Property Taxes

88.     The Debtors own their corporate headquarters.  In addition, the Debtors lease retail space in 40 states plus the Commonwealth of Puerto Rico where they conduct business. The Debtors' owned and leased real properties are subject to state and local real property taxes (the "Real Property Taxes"), for which the Debtors are accountable under numerous leases. The Debtors pay the Real Property Taxes through various outlets, depending on the particular lease agreement and/or the jurisdiction where the real property is located, including, but not limited to, via (a) direct remission by the Debtors, as lessees, to the Taxing Authorities; (b) escrow accounts for the applicable landlord; and/or (c) reimbursement to certain landlords that directly remit the Real Property Taxes to the Taxing Authorities.

### E.     Motion of the Debtors for Entry of an Order Authorizing Debtors to Pay Prepetition Wages, Compensation, Employee Benefits, and Other Associated Obligations

89.     Contemporaneously with the filing of this Declaration, the Debtors also filed a *Motion of the Debtors for Entry of an Order Authorizing Debtors to Pay Prepetition Wages, Compensation, Employee Benefits, and Other Associated Obligations*.

90.     The Debtors employ approximately 3,200 Employees.  Approximately 2,800 Employees are hourly wage earners (the "Hourly Employees") and approximately 400 are salaried personnel (the "Salaried Employees").  The Debtors also employ approximately 2,100

seasonal employees (the "Seasonal Employees") during the peak holiday season.[5]  The Debtors

supplement their business needs and workforce at their corporate headquarters with

approximately 5 independent contractors (the "Independent Contractors").

91.     The Employees and Independent Contractors perform a variety of critical

functions, including sales, customer service, purchasing, as well as administrative, accounting,

legal, finance, management, supervisory, and other related tasks.  Their skills, knowledge, and

understanding of the Debtors' infrastructure, operations, and customer relations are essential to

the effective operation of the Debtors' business.

### i.     Wage Obligations

92.     In the ordinary course of business, the Debtors incur payroll obligations for base

wages and overtime compensation owed to their Employees and Independent Contractors (the

"Wage Obligations").   All Employees are paid weekly.   The average weekly payroll for the

Debtor's Employees in a typical, non-Christmas season month, is approximately $1,400,000.00,

including payroll taxes.  The Debtor's administer their payroll and the disbursements of payroll

funds to Employees in-house.  Approximately half of all Employees are paid by direct deposit;

the other half receive a pre-loaded debit card issued by Metabank.

93.     Outstanding prepetition Wage Obligations include the following:

- Salaried Employees and Hourly Employees:  As of the Petition Date, the Debtors estimate that they owe approximately $850,000.00 in compensation earned by Salaried Employees and Hourly Employees in the ordinary course of business.

- Independent Contractors:  As of the Petition Date, the Debtors estimate that they owe approximately $30,000 in compensation earned by Independent Contractors in the ordinary course of business.

---

[5] Due to the timing of the Debtor's bankruptcy filing, most, if not all, of the Seasonal Employees have been terminated in the ordinary course of business as of late December 2013 or early January 2014.

ii.     **Vacation, Personal, Sick Time and Reimbursable Expenses**

94.     The Debtors offer their Employees other forms of compensation, including vacation time, paid holidays, other personal time off, and reimbursement of certain business expenses.  These forms of compensation are usual, customary and necessary if the Debtors are to retain qualified employees to operate their business.

a.     *Paid Time Off*

95.     Employees are eligible to accrue paid vacation, sick and personal days (collectively, "Paid Time Off"). The amount of Paid Time Off available to an Employee is generally determined by the Employee's position and length of employment.  When taking these factors into account, Employees generally receive 3 weeks of Paid Time Off per year.

96.     Upon termination of an Employee, the Employee's final paycheck includes any accrued but unused Paid Time Off.  As of March 28, 2014, the Debtors estimate that they are responsible for Paid Time Off totaling approximately $1,071,066.93 (the "Unpaid PTO").  This amount, however, is not a current cash pay obligation as Employees are only entitled to be paid for accrued but unused Paid Time Off upon termination.

b.     *Expense Reimbursement*

97.     The Debtors routinely reimburse Employees for certain expenses within the scope of their employment, including expenses for travel, cell phones, and out-of-pocket expenses (collectively, the "Reimbursable Expenses").  Certain Employees have not yet been reimbursed for Reimbursable Expenses previously incurred.  The Debtors typically pay between $30,000.00 and $50,000.00 in Reimbursable Business Expenses per week.  The Debtors process expenses reports on an ongoing basis.  The Debtors estimate that they have approximately $50,000.00 in prepetition Reimbursable Expenses outstanding, although there may be certain additional

Reimbursable Expenses where a reimbursement request has not yet been received (the "Unpaid Reimbursable Expenses").

### iii.    Employee Benefit Plans

98.    The Debtors provide Employees and their dependents with a number of employee benefit plans, including medical, dental, vision, and life insurance plans (collectively, the "Employee Benefit Plans").

#### a.    Medical Plans

99.    The Debtors provide a number of Employees and their dependents with medical, dental, and vision benefits (the "Medical, Dental and Vision Plan") under a self-funded plan administered by Cigna.   As of January 1, 2014, approximately 1,400 persons, including Employees and Employee dependents, are covered under the Medical, Dental and Vision Plan.

100.    The Medical, Dental and Vision Plan is funded through contributions by participating Employees and by the Debtors.   The cost of the Medical, Dental and Vision Plan is borne primarily by the Debtors, but Employees contribute 24% through payroll deductions. Employee Contributions are deducted from their paychecks to pay for that month's coverage.

101.    The Medical, Dental and Vision Plan costs the Debtors approximately $105,000.00 on average each month.   This amount includes all payments for administrative fees paid to Cigna, Metlife, Visions Solutions, HCC, and Employees' claims.   As of the Petition Date, the Debtors estimate that their liability for claims under the Medical, Dental and Vision Plan was approximately $500,000.00.

#### b.    Life, Short-Term and Long-Term Disability Plans

102.    The Debtors provide short-term and long-term disability, basic term life, and accidental death and dismemberment insurance coverage for all Salaried Employees.

(collectively, the "Employee Insurance Coverage").  Prudential provides the Employee Insurance Coverage.

103.    As of the Petition Date, approximately $15,000.00 is owed on account of Employee Insurance Coverage for the current plan year (the "Unpaid Employee Insurance Coverage").

### iv.    Savings and Retirement Plans

104.    In the ordinary course of business, the Debtors maintain a 401(k) plan for the benefit of all eligible Employees (the "401(k) Plan"), which is administered by Fidelity.  The 401(k) Plan generally provides for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating Employee's paycheck. The Debtors do not match such contributions.  Approximately 225 Employees currently participate in the 401(k) Plan, and the approximate weekly amount withheld from Employee paychecks on account of such 401(k) Plan is $25,000.00.  As of the Petition Date, the Debtors hold in trust approximately $25,000.00 in Employee 401(k) Plan contributions (the "Unremitted 401(k) Contributions").

### v.    Workers' Compensation

105.    The Debtors maintain workers' compensation insurance with Sentry Insurance ("Sentry") for their Employees at the mandated levels required by each state in the United States where the Debtors operate (the "Workers' Compensation Program").  The Debtors self-insure the Workers' Compensation Program up to $350,000.00.  After this threshold is reached, Sentry provides coverage.

### vi.    Employer Taxes

106.    The Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties (the "Employer Taxes and Deductions"). The Employer Taxes and Deductions include deductions for garnishments and child support and withholdings related to social security, Medicare and Medicaid, federal, state, and local income taxes, and employment insurance. As of the Petition Date, the Debtors estimate that approximately $400,000.00 in Employer Taxes and Deductions have been collected but not yet remitted to the appropriate third-party recipients (the "Unremitted Employer Taxes and Deductions").

### F.    Motion of the Debtors for Entry of an Order Authorizing Debtors to Maintain Existing Insurance Policies, Pay All Policy Premiums and Brokers' Fees Arising Thereunder, and Renew or Enter into New Policies

107.    Contemporaneously with the filing of this Declaration, the Debtors also filed a *Motion of the Debtors for Entry of an Order Authorizing Debtors to Maintain Existing Insurance Policies, Pay All Policy Premiums and Brokers' Fees Arising Thereunder, and Renew or Enter Into New Policies.*

### i.    Insurance Policies

108.    The Debtors maintain 14 insurance policies (the "Insurance Policies") that have been obtained through several third-party insurance carriers (the "Insurance Carriers"), which provide coverage for, *inter alia,* commercial general liability, workers' compensation, directors' and officers' liability, property, employment practices, automobiles, cyber and crime. A list of the Insurance Policies and broker is attached as **Exhibit 1** to the motion. Continuation of the Insurance Policies is essential to the minimization of risk and preservation of the Debtors'

estates.  In many cases, these Insurance Policies are mandatory because of the applicable laws, regulations and contracts that require the maintenance of coverage.

109.    The Debtors pay some premiums monthly and others lump sum.  The Debtors are generally current on amounts owed to maintain the Insurance Policies.  Certain amounts owed in connection with the Insurance Policies, however, are paid in arrears or have otherwise accrued before the Petition Date and have not yet been paid.  As of the Petition Date, the Debtors estimate that a total of approximately $145,330.00 in prepetition amounts are outstanding under the Insurance Policies.  Additionally, other payments may come due in the future that relate to Insurance Policy obligations incurred prepetition.

### ii.    Brokerage Relationship

110.    Marsh USA, Inc. ("Marsh") serves as the Debtors' insurance broker and also manages the Debtors' relationship with the Insurance Carriers.  Among other things, Marsh represents the Debtors in various ongoing negotiations with some of the Insurance Carriers. Marsh enables the Debtors to obtain the insurance coverage necessary to operate their business in a reasonable and prudent manner and to realize considerable savings in its procurement.

111.    The Debtors' relationship with Marsh is governed by an annual compensation agreement dated December 15, 2013 (the "Marsh Agreement"), whereby the Debtors must pay Marsh an annual service fee of $122,000.00, which was due on December 16, 2013.  Pursuant to the Marsh Agreement, Marsh also receives commissions from certain Insurance Carriers providing commission-based coverage.  Marsh credits against the annual fee any retail commissions that it collects from Insurance Carriers providing fee-based coverage.  In addition, the Debtors agree to pay any taxes and fees incurred in connection with insurance that Marsh places.  The Marsh Agreement limits Marsh's liability to the Debtors to $10 million.

**G.   Motion of the Debtors for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Practices and Programs in the Ordinary Course of Business**

112.   Contemporaneously with the filing of this Declaration, the Debtors also filed *Motion of the Debtors for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Customer Practices and Programs in the Ordinary Course of Business*.

113.   Before the Petition Date and in the ordinary course of their business, the Debtors provided their customers with certain benefits in the form of warranties, gift cards/certificates, promotional discount programs offered through Groupon® and Living Social®, private label credit cards, returns, refunds and adjustments.   The benefits conferred upon or owed to customers pursuant to these Customer Programs will be referred to as the "Customer Obligations."

**i.   Warranty Program**

114.   Through an Administration Agreement with Bankers Warranty Group, Inc. ("BWG"), the Debtors offer warranties on certain products equipped with moving parts, such as toy helicopters and massage chairs (the "Warranty Program").   By purchasing these warranties, customers are able to replace a malfunctioning product or repair it within a pre-specified time period.   These warranties are not included in the cost of the product and are purchased separately.   The warranty price depends on the value of the product it covers.

115.   To administer the program, BWG receives a percentage of the warranty sales.   As of the Petition Date, the Debtors estimate that approximately $125,000.00 is owed to BWG.   The Administration Agreement is nearing its conclusion.

116.    The Warranty Program is very valuable to the Debtors' ongoing business and revenues.  The Debtors generated approximately $4,200,000.00 in revenue from warranty sales in fiscal year 2013.  The Debtors anticipate that continuing the Warranty Program will promote future sales by assuaging customer concerns of malfunctioning products.  Dishonoring these programs may cause customer attrition, devaluation of the brand and reduction in future sales.  Similarly, paying BWG's outstanding fees is vitally important because BWG services the warranties and its failure to do so in the future would betray the customers' trust.

### ii.    Gift Card/Certificate Program

117.    Before the Petition Date, the Debtors sold in the ordinary course of business pre-paid gift cards and certificates to be used for purchasing goods from the Debtors' stores or through the Debtors' website (the "Gift Card/Certificate Program").  As of the Petition Date, there are approximately $6,100,000.00 of gift cards/certificates that have not been redeemed by the customers.  Failure to honor these obligations may tarnish the Debtors' reputation and may cause a decline in sales.  With notable days of celebration such as Mother's and Father's Day in the near future, where many sales are facilitated through gift cards/certificates, the inability to honor and continue the Gift Card/Certificate could harm the Debtors' business.

### iii.    Groupon®/Living Social® Program

118.    The Debtors also offer discounted promotional programs through Groupon® and Living Social® (the "Groupon/Living Social Program").  These programs enable customers to pre-purchase at less than par value coupons redeemable for goods or services from the Debtors' stores or through the Debtors' website.  As of the Petition Date, there are no outstanding coupons that have not been redeemed and there are no outstanding service fees owed to Groupon® or Living Social®.

### iv.     Credit Card Program

119.    The Debtors offer credit cards to their customers by engaging other lenders, such as Wells Fargo, to issue the credit cards (the "Credit Card Program").   Under this program, customers apply for Brookstone credit cards at stores or other locations of the Debtors.   Wells Fargo processes these applications, issues the credit cards and administers the Credit Card Program in exchange for certain fees.   Customers then use these credit cards to purchase the Debtors' products or services on credit.   The current agreement with Wells Fargo was recently extended through March 2015.

120.    Currently, there are approximately 5,354 active credit card accounts.   During fiscal year 2013, the Debtors generated approximately $12,600,000.00 under the Credit Card Program.   These credit card accounts are therefore important to the Debtors' business because they facilitate sales, generate revenue, and ensure customer loyalty and repeat business.

### v.     Return/Refund Program

121.    Certain customers also hold contingent claims against the Debtors for refunds, returns, exchanges, price adjustments and other credit balances (collectively, the "Return/Refund Program") in connection with goods sold or services rendered to customers in the ordinary course of business before the Petition Date.   As of the Petition Date, it is anticipated that checks issued by the Debtors for refunds made pre-petition may not have yet been cashed by customers. Estimating the aggregate amount of potential refunds owed is difficult due to the customers' individualized behavior.   Continuing the Return/Refund Program is important to preserve the customers' trust and confidence in future sales, and to maintain the Debtors' goodwill.

**H.**     **Motion of the Debtors for Entry of Interim and Final Orders (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment**

122.     Contemporaneously with the filing of this Declaration, the Debtors also filed a *Motion of the Debtors and Debtors in Possession for Entry of Interim and Final Orders (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment.*

123.     In the ordinary course of business, the Debtors obtain water, sewer, gas, heat, electricity, telephone, and similar utility products and services (collectively, the "Utility Services") from various utility providers (the "Utility Providers").  In 2013, the Debtors paid an average of approximately $406,000.00 per month on account of the Utility Services.

124.     Uninterrupted Utility Services are essential to the Debtors' ongoing operations. Indeed, any interruption in Utility Services – even for a brief period of time – would negatively affect the Debtors' operations, customer relationships, revenues, and profits.

**I.**     **Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507, (a) Authorizing Debtors to Obtain Post-Petition Financing and Grant Senior Liens and Superpriority Claims, (b) Authorizing Use of Cash Collateral, (c) Granting Liens and Providing Superpriority Claims, (d) Granting Adequate Protection, (e) Modifying the Automatic Stay, (f) Scheduling Final Hearing, and (g) Granting Related Relief**

125.     Contemporaneously with the filing of this Declaration, the Debtors also filed a *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507, (a) Authorizing Debtors to Obtain Post-Petition Financing and Grant Senior Liens and Superpriority Claims, (b) Authorizing Use of Cash Collateral, (c) Granting Liens and*

*Providing Superpriority Claims, (d) Granting Adequate Protection, (e) Modifying the Automatic Stay, (f) Scheduling Final Hearing, and (g) Granting Related Relief.*

### i.     Description of DIP Facility

126.     In connection with financing their ongoing operations during these Chapter 11 Cases, the Debtors propose the establishment of a superpriority secured debtor-in-possession credit facility (the "DIP Facility").  The first component of the DIP Facility involves Term Loan Facility Tranche A, a $60.00 million principal amount delayed-draw term loan facility that will provide for term loans (collectively, the "Tranche A Term Loans").  The interest rate will be 5.50% per annum and the closing fee will be 1.25%, payable on Closing Date.  The second component involves Term Loan Facility Tranche B, a $36.25 million principal amount term loan facility consisting of (a) $6.25 million principal amount of new money term loans (the "Tranche B New Money Loans") and (b) $30.0 million principal amount of deemed term loans that shall roll-up Second Lien Notes held by certain DIP Lenders in the same principal amount (to be allocated ratably to such DIP Lenders) (the "Roll-up Amount", and together with the Tranche B New Money Loans, the "Tranche B Term Loans").  The Tranche B Term Loans will have an interest rate of 0.30% paid-in-kind per annum, and will have no closing fee.

127.     The proceeds of the DIP Facility will be used for working capital and for general corporate purposes, subject to the Approved DIP Budget, including (a) to repay all amounts outstanding under the pre-petition Wells Fargo revolver and term loan facility as of the petition date and to cash collateralize any letters of credit issued and outstanding thereunder, (b) to roll-up a portion of the existing Second Lien Notes, (c) to pay the fees, costs and expenses of the DIP Agent and DIP Lenders, (d) to post cash collateral in respect of post-petition letters of credit to be issued for the benefit of the Debtors by a financial institution satisfactory to the DIP Lenders

and (v) to fund weekly into a segregated account of the Debtors (subject to appropriate control agreements), the fees, costs and expenses of the Debtors' estates' professionals incurred prior to termination of the DIP Facility in the amounts set forth in the Approved DIP Budget, which amounts shall only be used by the Debtors to pay the allowed fees and expenses of estate professionals in accordance with the Approved DIP Budget.

128.    The Debtors have retained Wilmington Savings Fund Society, FSB as the proposed DIP Agent.  The DIP Agent will receive an administration fee of $50,000.00 payable on date of the closing of any sale of the Debtors. Further details are outlined in the motion and the exhibits attached thereto.

**ii.    Necessity of DIP Facility Financing**

129.    The Debtors have an immediate and critical need to obtain credit pursuant to the DIP Facility in order to permit, among other things, the orderly continuation of the operation of their businesses and the preservation of the going concern value of their estates.  The ability of the Debtors to finance their operations,  maintain business relationships with vendors, suppliers and customers, pay their employees and otherwise sustain their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their assets and properties in the ordinary course of business without the DIP Facility.

130.    The immediate repayment of the Prepetition Credit Facility and the establishment of the Prepetition Credit Facility Reimbursement Account in accordance with the terms of the proposed Interim Order is necessary, as the Prepetition Credit Facility Parties have not otherwise

consented to the use of their Cash Collateral or the subordination of their Prepetition Credit Facility Liens to the DIP Liens.

131.    The proposed financing under the DIP Facility is critical to maintain an appropriate level of liquidity and fund the Debtors' day-to-day operations.  Furthermore, the DIP Facility was heavily negotiated at arms' length in connection with the simultaneous negotiation of either a sale of the Debtors or a comprehensive restructuring of the Debtors under the terms of the Restructuring Support Agreement with the Ad Hoc Committee.

132.    The Debtors have diligently sought, and in light of the plan support committed to by the DIP Lenders, are unable to obtain financing on more favorable terms from other sources.

**J.      Motion of the Debtors for Entry of an Order Authorizing Debtors to Pay Prepetition Customs, Shipper, Warehousemen and Common Carrier Obligations**

133.    Contemporaneously with the filing of this Declaration, the Debtors also filed a *Motion of the Debtors for Entry of an Order Authorizing Debtors to Pay Certain Prepetition Customs, Shipper, Warehousemen and Common Carrier Obligations*.

134.    In the ordinary course of their business, the Debtors purchase goods and merchandise from vendors throughout the United States, and in some instances, from vendors located outside the United States.  For example, the value of the goods and merchandise imported by the Debtors in 2013 was approximately $95,623,896.00.

135.    In purchasing goods and merchandise from foreign countries, the Debtors incur customs duties (the "Customs Duties") charged by the relevant governmental authorities (the "Customs Authorities"), brokers fees (the "Brokers Fees") charged by the Debtors' customs broker (the "Customs Broker"), warehousing-related fees and expenses (the "Warehousing Charges") and shipping and freight-related fees and expenses (the "Shipping Charges" and, together with the Warehousing Charges, the "Shipping and Warehousing Charges") to third party

shippers, haulers, warehousemen, common carriers, and other transporters (the "Shippers and Warehousemen").  The Debtors incur Shipping and Warehousing Charges also in connection with the storage and movement of goods within the United States.

### i.    Customs Duties and Brokers Fees

136.    Certain of the products imported and purchased by the Debtors are subject to Customs Duties (the "Surcharged Goods"), including merchandise-processing fees, imposed by the laws of the United States.  Accordingly, to coordinate the importation of goods and the payment of Customs Duties, the Debtors engage a customs broker to take all actions necessary, including making payment, to obtain the release of imported Surcharged Goods for delivery to the Debtors.

137.    Prompt payment of the Customs Duties allows the Debtors' inventory to flow quickly and efficiently to customers.  As of the Petition Date, the Debtors estimate that approximately $21,000.00 is owed in Customs Duties and approximately $1,000.00 in Brokers Fees.

### ii.    Shipping and Warehousing Charges

138.    Additionally, in the ordinary course of business, the Debtors incur certain fees and charges to Shippers and Warehousemen for shipping, transporting, storing, and delivering goods through established distribution networks.  The Debtors utilize carriers by sea and land to transport and forward their goods and merchandise domestically and internationally.  Some of these carriers also store the Debtors' goods and merchandise while they await delivery instructions from the Debtors or for orders to be fulfilled.  The Debtors depend on these Shippers and Warehousemen for the timely and consistent delivery of goods from their Distribution

Center to the Debtors' stores, customers, and vendors.  The services provided by Shippers and Warehousemen are critical to the daily operations of the Debtors' retail business.

139.    As of the Petition Date, the Debtors estimate they owe approximately $396,810.00 in prepetition Shipping Charges and approximately $1,711.00 in Warehousing Charges.

**K.**      **Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of K&L Gates LLP as Their General Bankruptcy Counsel *Nunc Pro Tunc* to the Petition Date**

140.    Contemporaneously with the filing of this Declaration, the Debtors have also filed an *Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of K&L Gates LLP as Their General Bankruptcy Counsel Nunc Pro Tunc to the Petition Date*.

141.    The Debtors desire to employ and retain K&L Gates LLP ("K&L Gates") as their general bankruptcy counsel in these Chapter 11 Cases.  K&L Gates is both well qualified and uniquely able to represent them in these Chapter 11 Cases in an efficient and effective manner. K&L Gates has extensive experience in bankruptcy and restructuring matters, including those involving sophisticated retail businesses like the Debtors.

142.    K&L Gates has represented the Debtors since 2010 in certain restructuring and corporate matters and, as such, has become intimately familiar with the Debtors' business affairs and capital structure.

143.    K&L Gates will render general legal services as needed, including, but not limited to, the following:

        a.      Advising and assisting the Debtors with respect to their rights, powers and duties as debtors-in-possession in the continued management and operation of their businesses and properties;

<table>
<tr><td>b.</td><td>Advising the Debtors on the conduct of the Chapter 11 Cases, including all of the legal and administrative requirements of operating in chapter 11;</td></tr>
</table>

      b.      Advising the Debtors on the conduct of the Chapter 11 Cases, including all of the legal and administrative requirements of operating in chapter 11;

      c.      Preparing necessary pleadings, motions, applications, draft orders, notices, schedules and other documents, and reviewing all financial and other reports to be filed in these cases, and advising the Debtors concerning, and preparing responses to, applications, motions, other pleadings, notices and other papers that may be filed and served in these cases;

      d.      Attending meetings to negotiate with representatives of the creditors and other parties in interest;

      e.      Appearing in Court and any appellate courts to represent and protect the interests of the Debtors and their estates;

      f.      Advising the Debtors in connection with obtaining postpetition financing and the use of cash collateral;

      g.      Advising and assisting the Debtors in connection with the formulation, negotiation and promulgation of a sale of substantially all their assets (the "Sale") and related documents, and taking all further actions as may be required in connection with the Sale during these cases;

      h.      Performing all other necessary legal services in connection with these Chapter 11 Cases.

144.    Consistent with the terms of the engagement letter (the "Engagement Letter") by which they retained K&L Gates, the Debtors paid K&L Gates an advanced payment retainer as follows (collectively, the "Retainer"):  (a) $250,000 on January 10, 2014; (b) a replenishment of the Retainer on January 24, 2014; (c) a replenishment of the Retainer on February 13, 2014, (d) a replenishment of the Retainer on February 24, 2014; (e) a replenishment of the Retainer on March 6, 2014; and (f) a replenishment of the retainer on March 24, 2014.

145.    I have further been informed, as also reflected in the *Declaration of Charles A Dale III in Support of Application of the Debtors for Entry of an Order Authorizing the Employment of and Retention of K&L Gates LLP as Their General Bankruptcy Counsel Nunc*

*Pro Tunc to the Petition Date* (the "Dale Declaration"), that K&L Gates is a disinterested entity and has no conflict of interests that would impair its ability to perform its duties and obligations under the Engagement Letter, or to successfully represent the Debtors in these Chapter 11 Cases.

**L.      Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Deloitte Transactions and Business Analytics LLP as Financial Advisor to the Debtors *Nunc Pro Tunc* to the Petition Date**

146.     The Debtors will also file an *Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Deloitte Transactions and Business Analytics LLP as Financial Advisor to the Debtors Nunc Pro Tunc to the Petition Date*.

147.     On April 1, 2014, the Debtors and Deloitte entered into an engagement letter agreement (the "Deloitte Engagement Agreement"), whereby Deloitte would provide financial advisory services to the Debtors.

148.     Deloitte is recognized for its expertise in providing financial advisory services to financially distressed companies, including advising debtors, creditors and other constituents in chapter 11 proceedings in numerous cases.

149.     I have further been informed that Deloitte is a disinterested entity and has no conflict of interests that would affect its impartiality in performing its duties and obligations under the Deloitte Engagement Agreement.

**M.    Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Jefferies, LLC as Investment Banker to the Debtors *Nunc Pro Tunc* to the Petition Date**

150.    Contemporaneously with the filing of this Declaration, the Debtors also filed *Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Jefferies, LLC as Investment Banker to the Debtors Nunc Pro Tunc to the Petition Date*.

151.    By letter dated January 8, 2014 (the "Jefferies Engagement Letter"), a true and accurate copy of which is attached to the application, the Debtors retained Jefferies as their investment banker.  Jefferies is a full-service global investment banking firm with expertise across a full range of products and services in investment banking, equities, fixed income, commodities, and wealth and asset management.

152.    The Debtors retained Jefferies because its professionals have extensive experience working with financially-distressed companies in and out of chapter 11.  As a result of rendering prepetition services to the Debtors, Jefferies is intimately familiar with the Debtors' corporate and capital structure, management, operations, and various other aspects of their business, and, consequently, Jefferies is best-positioned to assist the Debtors in these Chapter 11 Cases.

153.    I have further been informed that Jefferies is a disinterested entity and has no conflict of interests that would affect its impartiality in performing its duties and obligations under the Jefferies Engagement Agreement.

**N.    Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Landis Rath & Cobb LLP as Delaware and Conflicts Counsel for the Debtors and Debtors-in-Possession, Nunc Pro Tunc to the Petition Date, Pursuant to Bankruptcy Code Section 327(a), Bankruptcy Rule 2014 and Local Rule 2014-1**

154.    Contemporaneously with the filing of this Declaration, the Debtors filed an *Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Landis Rath & Cobb LLP as their Delaware and Conflicts Counsel for the Debtors and Debtors-*

*in-Possession, Nunc Pro Tunc to the Petition Date, Pursuant to Bankruptcy Code Section 327(a),*

*Bankruptcy Rule 2014 and Local Rule 2014-1.*

155.    The Debtors desire to employ and retain Landis Rath & Cobb LLP ("LRC") as

their Delaware and conflicts counsel because of the firm's knowledge of the Debtors' businesses

and financial affairs and its extensive experience and knowledge, with particular emphasis on its

national expertise in the field of debtor and creditor law and business reorganizations under

Chapter 11 of the Bankruptcy Code.

156.    In assisting with the preparation of the Debtors' cases, LRC worked closely with

the Debtors and the Debtors' general bankruptcy counsel, K&L Gates, and has become

intimately familiar with the Debtors' business affairs and capital structure, and will be able to

immediately assist the Debtors and their general bankruptcy counsel in their efforts in these

cases.

157.    The Debtors anticipate that, in connection with these cases, LRC will render

general legal services as needed, including, but not limited to, the following:

    a.    Advising and assisting the Debtors with respect to their rights,
          powers and duties as debtors-in-possession, and taking all
          necessary action to protect and preserve the Debtors' estates,
          including prosecuting actions on the Debtors' behalf, defending
          any actions commenced against the Debtors, negotiating all
          disputes involving the Debtors, and preparing objections to claims
          filed against the Debtors' estates;

    b.    Providing legal advice regarding Delaware law and the local rules,
          practices and procedures and providing substantive and strategic
          advice on how to accomplish the Debtors' goals in connection with
          the prosecution of these cases, bearing in mind that the Court relies
          on Delaware counsel to be involved in all aspects of each
          bankruptcy proceeding;

    c.    Preparing and maintaining critical dates memorandum to monitor
          pending pleadings, applications, motions, hearing dates and other
          matters and the deadlines associated therewith; distributing critical
          dates memorandum to the other professionals retained by the

Debtors for review and any necessary coordination for pending matters;

d. Monitoring the docket for filings and coordinating with K&L Gates on pending matters that require a response;

e. Preparing and filing necessary pleadings, applications, draft orders, notices, schedules and other documents, and reviewing all financial and other reports to be filed in these cases, and advising the Debtors concerning, and preparing responses to, applications, Applications, other pleadings, notices and other papers that may be filed and served in these cases in coordination with K&L Gates and coordinating with the Debtors' claims agent for service of documents;

f. Preparing hearing binders of documents and pleadings, printing of documents and pleadings for hearings;

g. Handling inquiries and calls from creditors and counsel to interested parties regarding pending matters and the general status of these Chapter 11 cases, and, to the extent required, coordinating with K&L Gates on any necessary responses;

h. Attending meetings and negotiating with representatives of the creditors and other parties in interest;

i. Appearing in Court, any appellate courts and at any meetings of creditors to represent and protect the interests of the Debtors and their estates;

j. Advising and assisting the Debtors in maximizing value in these cases, including, without limitation, in connection with the formulation, negotiation and promulgation of a sale of substantially all of their assets (the "Sale") and/or a disclosure statement and Chapter 11 plan and all documents related thereto, and taking all further actions as may be required in connection with any Sale, disclosure statement or plan during these cases;

k. Performing all other necessary legal services for the Debtors in connection with the prosecution of these Chapter 11 cases in coordination with K&L Gates, including, but not limited to: (i) analyzing the Debtors' leases and contracts and the assumptions, rejections, or assignments thereof, (ii) analyzing the validity of liens against the Debtors, (iii) advising the Debtors on corporate and litigation matters, and (iv) developing a reorganization strategy; and

l.      Serving as conflicts counsel in the event that K&L Gates is unable to represent any of the Debtors with regard to any particular matter due to an actual or potential conflict of interest.

158.    Within ninety (90) days of the Petition Date, LRC received advance fee retainer payments from the Debtors on January 14, 2014 in the amount of $100,000 and March 27, 2014 in the amount $75,000 (together, the "LRC Retainer") in advance payment for and to secure the payment of actual and estimated professional fees and disbursements to be incurred prior to the Petition Date and, to the extent of any unused portion of the LRC Retainer, to continue to secure the payment of LRC's fees and expenses to be incurred in these cases.

159.    I have further been informed, as also reflected in the *Declaration of Adam G Landis in Support of Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Landis Rath & Cobb LLP as their Delaware and Conflicts Counsel for the Debtors and Debtors-in-Possession, Nunc Pro Tunc to the Petition Date, Pursuant to Bankruptcy Code Section 327(a), Bankruptcy Rule 2014 and Local Rule 2014-1* (the "Landis Declaration"), that LRC is a disinterested entity and has no conflict of interests that would impair its ability to perform its duties and obligations, or successfully represent the Debtors in these Chapter 11 Cases.

## Declaration

160.    Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

### **Relief Requested**

161.    I respectfully request that the Court grant all relief requested in the First Day

Pleadings and such other and further relief as may be just and proper.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

By: _____

James M. Speltz
President and Chief Executive Officer

Executed on:   4/3/14

**EXHIBIT A**

# BROOKSTONE CORPORATE STRUCTURE



8/1/2013

**Please see attached Airport Joint Venture Structure



Brookstone Stores, Inc.
(NH)

Big Blue Audio LLC

100%

Brookstone Holdings, Inc. (NH)

Brookstone Properties, Inc. (NH)

Brookstone O'Hare, LLC
70%

Brookstone/National Concessions Management Joint Venture (Nevada JV)
80%

National Concessions Management Brookstone Stores Georgia. LLC
49%

Brookstone Charlotte, LLC
74%

AREAS Brookstone Atlanta JV, LLC
49%

Brookstone Stores DTW, LLC
74%

Brookstone Dallas Fort Worth, LLC
65%

Brookstone Stores SAT, LLC
78%

Brookstone O'Hare II, LLC
70%

Brookstone O'Hare T-5, LLC
80%

National Concessions Management Brookstone Stores Georgia II, LLC
64%

Brookstone Houston T-B, LLC
65%

Nevada JV = Brookstone/National Concessions Management Joint Venture
JFK LLC = National Concessions Management Brookstone Stores JFK LLC
Georgia LLC = National Concessions Management Brookstone Stores Georgia LLC
Areas Brookstone LLC = Areas Brookstone Atlanta JV, LLC

8/1/2013