## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BROOKSTONE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10752 ( ) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507, (A) AUTHORIZING
DEBTORS TO OBTAIN POST-PETITION FINANCING AND GRANT SENIOR LIENS
AND SUPERPRIORITY CLAIMS, (B) AUTHORIZING USE OF CASH COLLATERAL,
(C) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIMS, (D)
GRANTING ADEQUATE PROTECTION, (E) MODIFYING THE AUTOMATIC STAY,
(F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (the "Debtors") by and through
their proposed undersigned counsel, hereby submit this *Motion of the Debtors for Entry of
Interim and Final Orders Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507, (a) Authorizing
Debtors to Obtain Post-Petition Financing and Grant Senior Liens and Superpriority Claims, (b)
Authorizing Use of Cash Collateral, (c) Granting Liens and Providing Superpriority Claims, (d)
Granting Adequate Protection, (e) Modifying the Automatic Stay, (f) Scheduling Final Hearing,
and (g) Granting Related Relief* (the "Motion"). In support of the Motion, the Debtors rely on
the *Declaration of James Speltz in Support of Debtors' Chapter 11 Petitions and First Day
Pleadings* (the "First Day Declaration"),[2] and respectfully represent and set forth as follows:

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are Brookstone Holdings Corp. (4638), Brookstone, Inc. (2895), Brookstone Company, Inc. (3478),
Brookstone Retail Puerto Rico, Inc. (5552), Brookstone International Holdings, Inc. (8382), Brookstone Purchasing,
Inc. (2514), Brookstone Stores, Inc. (2513), Gardeners Eden, Inc. (7793), Brookstone Military Sales, Inc. (2029),
Big Blue Audio LLC (N/A), Brookstone Holdings, Inc. (2515); and, Brookstone Properties, Inc. (2517). The
Debtors' corporate headquarters and the mailing address for each Debtor is One Innovation Way, Merrimack, NH
03054.

[2] Except where otherwise noted, capitalized terms used but not defined in this Motion have the meanings ascribed to
them in the First Day Declaration.

## PRELIMINARY STATEMENT

1.     Brookstone Holdings Corp. and certain of its direct and indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors") in the above-referenced Chapter 11 Cases (the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363, 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), is seeking, among other things:

(a)     authorization for Brookstone Holdings Corp. (the "Borrower") to obtain senior secured superpriority post-petition financing, and for all of the other Debtors (collectively, the "Guarantors", and collectively with the Borrower, the "Loan Parties") to jointly and severally guarantee the Borrower's obligations in connection with the DIP Facility (defined below), pursuant to that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of April 3, 2014 (together with all schedules and exhibits thereto, as the same may be amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit Agreement," and together with all agreements, notes, instruments, certificates or other documents related to, executed or otherwise delivered in connection therewith (including the Post-Petition LC Documents (defined below), as each may be amended, restated, supplemented or otherwise modified from time to time, the "DIP Documents"), by and among the Borrower, the Guarantors, the lenders party to the DIP Credit Agreement from time to time (the "DIP Lenders") and Wilmington Savings Fund Society, FSB as administrative agent and collateral agent for itself and the DIP Lenders (defined below) (in such capacities, collectively, the "DIP Agent"), providing for, *inter alia*, a first lien, superpriority, multiple draw term loan facility providing for the borrowing of term loans from time to time (in accordance with the DIP Budget (defined below) and subject to the terms and conditions of the DIP Documents) in an aggregate principal amount not to exceed $96.25 million (the "DIP Facility"), consisting of:

(i)     a multiple draw term loan facility (collectively, the "Tranche A New Money Term Loans") in an aggregate maximum principal amount not to exceed $60 million, of which (x) $55 million shall be drawn in a single draw by the Borrower on the Closing Date (defined below), and up to $43,419,755.24 of such draw shall be used to repay the Prepetition Credit Facility Obligations (defined below), up to $4,732,212.45 of which shall be used to cash collateralize letters of credit issued and outstanding under the Prepetition Credit Facility Documents (defined below) (the "Prepetition Letters of Credit") and up to $1,500,000 of which shall be used to cash collateralize the Post-Petition Letters of Credit (defined below)) and (y) $5 million shall be drawn on, or within five (5) business days after, entry of the Final Order; and

(ii) a term loan facility (the "Tranche B Facility") in an aggregate maximum principal amount of $36.25 million, consisting of: (a) a new money term loan in the aggregate principal amount of $6.25 million (the "Tranche B New Money Loan"), which shall be drawn in a single draw by the Borrower on the Closing Date, and (b) a deemed roll-up, as of the Closing Date, in respect of $30 million in aggregate principal amount (the "Roll-Up Amount") of Prepetition Notes (defined below) held by certain of the DIP Lenders (and/or their affiliates or related parties, an entity or an affiliate of an entity that administers or manages a DIP Lender or the same investment advisor or an advisor under common control with such DIP Lender, affiliate or advisor, as applicable) as of the Record Date (as defined in the DIP Credit Agreement) (the "Roll-Up DIP Loans", and together with the Tranche B New Money Loans, the "Tranche B Term Loans") in accordance with the DIP Documents;

(b) authorization for the Debtors to execute and deliver the DIP Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the payment of all principal, interest, fees, costs, expenses and other amounts payable under the DIP Documents as such amounts become due and payable, including, without limitation, administrative agent fees, closing fees and other fees payable thereunder, and the reasonable and documented fees and disbursements of attorneys and advisors engaged by the DIP Agent, the DIP Lenders and the Post-Petition LC Issuer (defined below) (collectively, and including, without limitation, all "Obligations" as defined in the DIP Credit Agreement, the "DIP Obligations") to the extent provided in and in accordance with the terms of the DIP Documents;

(c) authorization for the Borrower to establish a non-interest bearing post-petition cash collateral account (the "Post-Petition LC Cash Collateral Account") at Wilmington Savings Fund Society, FSB (in its capacity as the issuer of Post-Petition Letters of Credit (defined below), the "Post-Petition LC Issuer") pursuant to the terms and conditions of the Post-Petition LC Reimbursement Agreement (defined below) in which the Borrower shall maintain cash in an aggregate amount not to exceed the Post-Petition LC Cash Collateral Amount (defined below), to cash collateralize the Borrower's reimbursement obligations pursuant to that certain letter of credit reimbursement agreement, dated as of the Closing Date (as amended, restated, supplemented or otherwise modified from time to time, the "Post-Petition LC Reimbursement Agreement", and together with a cash collateral account pledge and security agreement (the "Post-Petition LC Security Agreement"), and all other pledge, deposit and security agreements related to the Post-Petition LC Reimbursement Agreement, or executed in connection therewith, and any application for irrevocable commercial letters of credit, collectively, the "Post-Petition LC Documents"), between the Post-Petition LC Issuer and certain of the Loan Parties, in each case, with respect to certain post-petition commercial, standby or documentary letters of credit (collectively the "Post-Petition Letters of Credit") to be issued by the Post-Petition LC Issuer, Branch Banking and Trust Company, or such other letter of credit issuer acceptable to the Required Lenders (as defined in the DIP Credit Agreement). The aggregate face amount of all such Post-Petition Letters of Credit shall not exceed $8,075,000 (the "Post-Petition Maximum LC Amount");

(d) authorization for the Debtors to grant (i) the DIP Liens (defined below) and the DIP Superpriority Claims (defined below) to the DIP Agent for the benefit of the DIP Lenders;

and (ii) the LC Lien (defined below) to the Post-Petition LC Issuer for the benefit of itself and any other issuer of a Post-Petition Letters of Credit issued in accordance with the Post-Petition LC Documents, each as more fully set forth in this Interim Order;

(e)    authorization for the Debtors to use, subject to the terms and conditions set forth in this Interim Order, Cash Collateral (defined below) and all other Prepetition Collateral (defined below), as more fully set forth in this Interim Order;

(f)    upon entry of this Interim Order and satisfaction or waiver of the conditions set forth in the DIP Documents, authorization for, *inter alia*, (i) the Debtors to borrow $55 million in Tranche A New Money Term Loans and $6.25 million in the Tranche B New Money Loans, (ii) the Roll-Up DIP Loans, (iii) the Debtors to immediately use the proceeds of the DIP Facility to, simultaneously with the initial draw under the DIP Facility, repay the Prepetition Credit Facility Obligations (defined below) in full (subject to paragraph 36 below) and cash collateralize Prepetition Letters of Credit, whereupon, subject to the occurrence of the Discharge Date (defined below), the existing liens, claims and encumbrances of the Prepetition Credit Facility Parties (defined below) shall automatically and irrevocably terminate, and any UCC (defined below) filings filed against the Joint Ventures (defined below) with respect to Airport Inventory (defined below) shall continue in effect and shall be deemed to be assigned to the DIP Agent on behalf of and for the benefit of the DIP Lenders (without any representation, warranty or recourse from or to the Prepetition Agent (defined below)), and to provide operating cash for the Debtors (subject to the terms of the DIP Documents and the DIP Budget (defined below)); (iv) fund the Post-Petition LC Cash Collateral Account to the extent necessary to allow for the issuance of Post-Petition Letters of Credit in accordance with the Post-Petition LC Documents in an aggregate amount not to exceed the Post-Petition Maximum LC Amount; (v) use Cash Collateral and other collateral and granting the adequate protection described herein; and (vi) granting related relief described herein; and

(g)    the modification of the automatic stay pursuant to section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors, the DIP Agent, the DIP Lenders, the Post-Petition LC Issuer and the Prepetition Secured Parties (defined below) to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order.

2.    The Debtors also request the scheduling of a final hearing (the "Final Hearing"),

to consider entry of a final order (the "Final Order") granting the relief requested in the Motion

and approving the form of notice with respect to the Final Hearing.

## JURISDICTION AND VENUE

3.    The United States Bankruptcy Court for the District of Delaware (the "Court")

has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended

Standing Order of Reference from the United States District Court for the District of Delaware

dated as of February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.[3] Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 363, 364, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2.

## GENERAL BACKGROUND

5.      On the Petition Date, the Debtors commenced the above-captioned the Chapter 11 Cases by each filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

6.      The Debtors continue to operate their business and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date of this Motion, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases.

7.      A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Chapter 11 Cases, are set forth in greater detail in the First Day Declaration, filed contemporaneously herewith and incorporated herein by reference.

## BANKRUPTCY RULE 4001 STATEMENT

8.      In accordance with Bankruptcy Rule 4001, the following sets forth a concise

---

[3] Pursuant to Local Rule 9013-1(f), the Debtors hereby confirm their consent to entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

summary of material terms of the proposed DIP Facility and the DIP Orders:[4]

| Borrower: | Brookstone Holdings Corp. |
|---|---|
| Guarantors: | Certain of the Borrower's direct and indirect subsidiaries. |
| DIP Agent: | Wilmington Savings Fund Society, FSB. |
| DIP Agent Administration Fee: | A $50,000 fee payable to DIP Agent on Closing Date. |
| DIP Lenders: | Certain holders of the 13.00% Second Lien Senior Secured Notes due 2014 (the "Prepetition Notes") issued by Brookstone, Inc., and/or the affiliates or related parties, an entity or an affiliate of an entity that administers or manages a DIP Lender of the same investment advisor or an affiliate or advisor. |
| DIP Facility: | A superpriority secured debtor-in-possession credit facility as follows: <br><br> Term Loan Facility Tranche A: A $60.00 million principal amount delayed-draw term loan facility that will provide for term loans with the following interest rate/fees: <br><br> • Interest Rate: 5.50% per annum. <br><br> • Closing Fee: 1.25% payable on Closing Date. <br><br> Term Loan Facility Tranche B: A $36.25 million principal amount term loan facility consisting of (a) $6.25 million principal amount of new money term loans and (b) $30.0 million principal amount of deemed term loans that shall roll-up Prepetition Notes held by certain DIP Lenders in the same principal amount (to be allocated ratably to such DIP Lenders). The Tranche B Term Loans will have the following interest rate/fees: <br><br> • Interest Rate: 0.30% paid-in-kind per annum. <br><br> • Closing Fee: None. <br><br> Borrowings under the DIP Facility shall be incurred as follows: (i) following entry of an order by the Bankruptcy Court approving the DIP Facility on an interim basis, an initial drawing of the DIP Facility on the Closing Date in an aggregate amount equal to (x) Tranche A Term Loans in the aggregate principal amount of $55.0 million and (y) the Tranche B Term Loans; and (ii) following entry of an order by the Bankruptcy Court approving the DIP Facility on a final basis, one additional Tranche A Term Loan in an aggregate principal amount equal to $5.0 million to be borrowed in accordance with the Approved DIP Budget (defined below); *provided*, that the additional Tranche A Term Loan shall be made within five (5) days of entry of the Final Order. |
| Prepayments: | Amounts outstanding under the Tranche A Term Loans and Tranche B New Money Loans may be repaid at any time without premium or penalty, and any such |

---

[4] This summary is not intended to limit the terms of the DIP Facility, including in respect of any use of Cash Collateral, in each case as set forth in the DIP Credit Agreement, the Interim Order and the Final Order. Reference should be made to the Interim Order, the DIP Credit Agreement and the Final Order for the full terms thereof. In the event of any inconsistency between this summary and the terms and conditions of the DIP Documents or of the Interim Order, the provisions of the DIP Documents and the Interim Order shall govern and control.

| | |
|---|---|
| | amounts may not be re-borrowed.  The Roll-up Amount may not be prepaid. |
| **Default Interest:** | Additional 200 bps per annum. |
| **Closing Date:** | Immediately upon satisfaction of the conditions precedent, expected to be about April 3, 2014 (the "<u>Closing Date</u>"). |
| **Maturity Date:** | The maturity date of the DIP Facility (the "<u>Maturity Date</u>") shall be the earliest of (i) the 12 month anniversary of the Closing Date, (ii) the effective date of a Chapter 11 plan of reorganization, (iii) the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, (iv) if a final order with respect to the DIP Facility is not entered, 35 calendar days after the Closing Date, and (v) the date of acceleration of the loans and the termination of the DIP commitments upon the occurrence of an event of default. |
| **Use of Proceeds:** | To provide working capital and for general corporate purposes, subject to the Approved DIP Budget (defined below), including (i) to repay all amounts outstanding under the pre-petition Wells Fargo revolver and term loan facility as of the petition date and to cash collateralize any letters of credit issued and outstanding thereunder, (ii) to roll-up a portion of the existing Prepetition Notes, (iii) to pay the fees, costs and expenses of the DIP Agent and DIP Lenders, (iv) to post cash collateral in respect of post-petition letters of credit to be issued for the benefit of the Debtors by a financial institution satisfactory to the DIP Lenders and (v) to fund weekly into a segregated account of the Debtors (subject to appropriate control agreements), the fees, costs and expenses of the Debtors' estates' professionals incurred prior to termination of the DIP Facility in the amounts set forth in the Approved DIP Budget (defined below), which amounts shall only be used by the Debtors to pay the allowed fees and expenses of estate professionals in accordance with the Approved DIP Budget (defined below). <br><br> No proceeds of the DIP Facility or any cash collateral shall be used to investigate, challenge, object to, contest or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under the Prepetition Notes documents, or the liens or claims granted under the Prepetition Notes documents, subject to an investigation budget for the unsecured creditors committee of $25,000. |
| **DIP Budget:** | The Debtors will prepare and deliver on or prior to the Closing Date a budget, in form and substance satisfactory to the DIP Lenders (the "<u>Approved DIP Budget</u>"), that shall reflect line item projected receipts and expenditures on a weekly basis, from the Closing Date for the 13-week period following the Closing Date.  The Debtors shall deliver two weeks prior to the end of the 13-week period covered by the Approved DIP Budget then in effect an updated budget, in form and substance satisfactory to the DIP Lenders, for the 13-week period immediately following the 13-week period covered by such then-current Approved DIP Budget.  The Debtors shall also provide a weekly cumulative Approved DIP Budget variance report since the petition date, on Wednesday of each week, starting in the first week after the petition date. |
| **Security:** | The DIP Obligations shall (A) be secured by (1) first priority perfected liens and security interests in all of the Debtors' unencumbered assets pursuant to Section 364(c)(2) of the Bankruptcy Code, (2) second priority perfected liens and security interests in all of the Debtors' assets that are subject to Permitted Existing Liens (as |

| | |
|---|---|
| | shall be defined) pursuant to Section 364(c)(3), and (3) priming first-priority perfected liens and security interests in all of the Debtors' assets that constitute collateral securing the Prepetition Notes pursuant to Sections 364(c)(2) and (d)(1), and (B) constitute allowed administrative expense claims senior to any pre- or post-petition claims, with priority over all other costs and expenses of administration of any kind, with recourse to all of the Debtors' assets (including avoidance actions and proceeds thereof, upon entry of the Final Order), subject, in each case, only to the Carve-Out (defined below). |
| **Closing Conditions, Draw Conditions, Representations and Warranties:** | Customary closing conditions, conditions precedent, representations and warranties for financings of this type.  Without limiting the foregoing, as a condition precedent to any obligation of the DIP Lender or DIP Agent on the Closing Date, the Restructuring Support Agreement executed on or prior to the Petition Date between the Debtors and certain holders of the Prepetition Notes must continue to be in effect. |
| **Covenants:** | Customary affirmative, negative, and financial covenants for financings of this type, and such other covenants that are satisfactory to the DIP Lenders, including, without limitation:<br><br>1. Compliance by the Debtors with the milestones attached to the RSA.<br><br>2. With respect to the Test Period ending on each Test Date, (i) commencing with the second Test Date occurring after the Closing Date make disbursements that would be included in the line-item "Total Disbursements" (the "Total Disbursement Line") in the Approved Budget (other than the disbursements that would be included in the line item "Total Restructuring" (the "Total Restructuring Disbursements")) during such Test Period in an aggregate amount which would exceed by more than twelve and one-half percent (12.5%) the aggregate amount of disbursements (other than the Total Restructuring Disbursements) budgeted in the Total Disbursements Line in the Approved Budget for such Test Period and (ii) commencing with the third Test Date occurring after the Closing Date, permit receipts that would be included in the line-item "Total Receipts" in the Approved Budget (the "Total Receipts Line") during such Test Period to be in an aggregate amount less than eighty-seven and one-half percent (87.5%) of receipts budgeted in the Total Receipts Line in the Approved Budget for such Test Period.<br><br>3. With respect to the week ending on each Test Date, permit the actual total balances that would be included in the line-item "Total Working Capital Balances" (the "Total Working Capital Line") in the Approved Budget (other than accounts receivable that would be included the line item "EOW Wholesale A/R" ("Wholesale A/R")) for such Test Date to be in an aggregate amount less than one-hundred percent (100%) of the difference between (x) the Total Outstandings as of such Test Date and (y) the amount set forth in the line-item "Ending Cash Balance" in the Approved Budget for such Test Date (which amount shall not include any amounts held in or credited to the Segregated Professional Fee Account but, for the avoidance of doubt, shall include any amounts deposited in the Concentration Account pursuant to Section 6.13).<br><br>4. With respect to the week ending on each Test Date, permit the actual total balances that would be included in the Total Working Capital Line (other |

|  | than Wholesale A/R) for such Test Date to be in an aggregate amount which would exceed by more than six percent (6%) the aggregate amount of balances budgeted in the Total Working Capital Line (other than Wholesale A/R) in the Approved Budget for such Test Date. |
|  | 5. Make or commit to make Capital Expenditures during the term of this Agreement in an aggregate amount in excess of $1,000,000. |
|  | 6. Permit Liquidity (which, for the avoidance of doubt, shall include any amounts deposited in the Concentration Account pursuant to Section 6.13) at any time to be less than $3,000,000. |
| **Cash Management** | The Debtors shall continue to use their Current Master Accounts at Wells Fargo, subject to the provisions of the Interim Order related to entry into one or more deposit account control agreements related thereto. The Debtors shall also create new segregated accounts for certain reserves required pursuant to the Interim Order, including the Post-Petition LC Cash Collateral Account, the Prepetition Credit Facility Reimbursement Account, the Segregated Professional Fee Account for the benefit of the Post-Petition LC Issuer, the Prepetition Credit Facility Parties and the Professionals, each as defined therein. |
| **Financial Reporting:** | The Debtors shall provide weekly, monthly, quarterly, and annual financial reports and statements at the times and with the content required by the DIP Credit Agreement. |
| **Milestones:** | The DIP Facility shall contain the milestones (the "Milestones") contained in the Restructuring Term Sheet under the heading entitled "Milestones". |
| **Events of Default:** | Customary events of default for financings of this type (each, an "Event of Default"), including, without limitation, failure to achieve Milestones, the filing of any Chapter 11 plan or the commencement of an alternative sale or restructuring in form or substance that is not acceptable to the DIP Lenders, or the termination of the Restructuring Support Agreement. The interim and final orders approving the DIP Facility shall include relief from the automatic stay with respect to the exercise of rights and remedies upon the occurrence of an Event of Default, subject to a five Business Day notice period. |
| **Credit Bidding:** | The DIP Lenders shall have the right to credit bid all amounts outstanding under the DIP Facility, in accordance with the Interim Order. |
| **Carve-Out:** | A carve-out (the "Carve-Out") for (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee; (b) the amount of allowed and unpaid fees, costs, and expenses of the estate's court-approved professionals in the Chapter 11 cases incurred prior to the occurrence of an Event of Default, not to exceed the amounts set forth in the Approved DIP Budget as of any applicable date of determination; and (c) the amount of allowed and unpaid fees, costs and expenses of the estate's court-approved professionals in the Chapter 11 cases incurred from and after the occurrence of an Event of Default in an aggregate amount not to exceed $350,000, of which $50,000 and $300,000 shall be available for the Debtor and Committee professionals, respectively. |
| **Adequate Protection to Holders of the Prepetition Notes:** | As adequate protection:<br><br>1. Stipulation by the Debtors with respect to the validity, enforceability, priority, security, and perfection of the Prepetition Notes and releases of all claims or causes of action with respect to the Prepetition Notes or the holders of the |

| | |
|---|---|
| | Prepetition Notes; |
| | 2.  To the extent of any post-petition diminution in the value of the collateral securing the Prepetition Notes, (i) Replacement liens (subject to the DIP liens) on all assets of the Debtors (including, subject to entry of a final order approving the DIP Facility, avoidance actions and proceeds thereof); and (ii) Section 507(b) claims (subject to the DIP claims) with recourse against all assets of the Debtors (including, subject to entry of a final order approving the DIP Facility, avoidance actions and proceeds thereof); |
| | 3.  Reimbursement of all pre- and post-petition fees, costs and expenses of the ad hoc committee of holders of the Prepetition Notes (the "Ad Hoc Committee"), including, without limitation, all fees and expenses of Stroock & Stroock & Lavan LLP as lead bankruptcy counsel, any necessary local counsel and a financial advisor, in accordance with the Approved DIP Budget; |
| | 4.  After giving effect to any mandatory prepayments set forth in the DIP Facility, paydown of the Prepetition Notes with the net cash proceeds of any sale of all, substantially all, or any portion of, the Debtors' assets, promptly following consummation thereof; |
| | 5.  Financial reporting satisfactory to the Ad Hoc Committee; and |
| | 6.  The right to credit bid all amounts then-outstanding under the Prepetition Notes. |
| **Miscellaneous:** | Among other customary miscellaneous provisions, the following: |
| | • Waiver of Section 506(c), marshalling and Section 552(b) equities of the case exception, upon entry of the Final Order. |
| | • Indemnification of DIP Agent and DIP Lenders and each of the their respective directors, officers, employees, agents, shareholders, affiliates, members and advisors, as provided for in the DIP Documents. |
| | • Reimbursement of all pre- and post-petition fees, costs and expenses of DIP Agent and DIP Lenders (including, without limitation, all fees and expenses of lead bankruptcy counsel, local counsel and financial advisor, or any other professionals, consultants or advisors retained by the DIP Agent or Ad Hoc Committee (including all accrued and unpaid fees and expenses)). |
| | • Subject to definitive documentation (including, without limitation, credit agreement(s), security agreement(s), motion, interim and final orders, and such other agreements, exhibits, schedules, instruments or filings as determined by the DIP Lenders in their sole discretion) satisfactory in each and every respect to the DIP Lenders in their sole discretion. |
| | • Assignments and participations. |
| | • Governing Law: New York. |

## DISCLOSURE PURSUANT TO BANKRUPTCY RULE 4001 AND COMPLIANCE WITH LOCAL RULE 4001-2

9.    The provisions described in Bankruptcy Rule 4001 (c)(1)(B)(i)-(xi), to the extent

applicable, are set out in the following sections of the DIP Credit Agreement and the Interim

Order:

- *Grant of a Priority or Lien on Property of the Estate*: Interim Order, ¶11-12. Credit Agreement, Section X.

- *Adequate Protection or Priority for a Claim that Arose Before Commencement of Chapter 11 Case*: Interim Order, ¶20. Credit Agreement, Section 1.01

- *Determination of Validity. Enforceability. Priority. or Amount of Claim that Arose Before Commencement of Case or of Any Lien Securing the Claim*: Interim Order, ¶¶4 and 36; Credit Agreement, Section 8.01

- *Waiver or Modification of Bankruptcy Code Provisions or Applicable Rules Relating to Automatic Stay*: Interim Order, ¶23; Section, Article 8.01

- *Waiver or Modification of Any Entity's Authority or Right to File Plan, Seek Extension of Exclusivity, Request Use of Cash Collateral or Request Authority to Obtain Credit*: Interim Order, ¶¶28, 29, 30; Credit Agreement, Section 6.16

- *Establishment of Deadlines for Filing Plan, Approval of Disclosure Statement, Hearing on Confirmation or Entry of Confirmation Order*: Interim Order, ¶29, Credit Agreement Section 6.16

- *Waiver or Modification of Applicability of Nonbankruptcy Law Relating to Perfection of Lien on Property of Estate or on Foreclosure or Other Enforcement of Lien*: Interim Order, ¶24; Credit Agreement, Section 10.02

- *Release, Waiver, or Limitation on any Claim or Other Cause of Action Belonging to Estate*: Interim Order, ¶¶4, 41; Credit Agreement Section 10

- *Indemnification of Any Entity*: Interim Order, ¶¶8, 47; Credit Agreement, Section 12.04

- *Release, Waiver, or Limitation of any Right under § 506(c)*:  Interim Order, ¶¶6(f), 12(c); Credit Agreement, Section 10.07(b).

- *Granting of a Lien on Any Claim or Cause of Action Arising Under 544, 545, 547, 548, 549, 553(b), 723(a) or 724(a)*: Interim Order, ¶11(b). Credit Agreement, Section 5.19

10.    Local Rule 4001-2(a)(i) also requires that certain provisions of the DIP Facility be

highlighted and that the Debtors provide justification for the inclusion of such highlighted provisions.  Set forth below are the provisions of the DIP Facility that are required to be identified in accordance with Local Rule 4001-2.

11.    *Waiver of Claims Against Secured Creditor*.  Local Rule 4001-2(a)(i)(B) requires identification of provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order for relief, or if a creditors' committee is formed, at least sixty (60) days from the date of its formation to investigate such matters (a "Challenge Period"). Del. Bankr. L. R. 4001-2(a)(i)(B).  Paragraph 36 of the Interim Order satisfies this requirement.

12.    *Section 506(c) Waiver*.  Local Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, without notice, of an estate's rights under 506(c) of the Bankruptcy Code. Del. Bankr. L. R. 4001-2(a)(i)(C).  The Interim Order provides that, subject to the entry of the Final Order, in exchange for (i) the Prepetition Note Parties', the DIP Agent's and the DIP Lenders' respective agreement to subordinate their liens and superpriority claims to the Carve-Out, and (ii) the Prepetition Note Parties' agreement to subordinate their Prepetition Note Liens to both the DIP Liens and the Carve-Out, the Prepetition Secured Parties, the DIP Agent and the DIP Lenders shall receive (a) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code. Interim Order, ¶¶6(f), 12(c).

13.    *Liens on Avoidance Actions*.    Local Rule 4001-2(a)(i)(D) requires the identification of provisions that immediately grant to prepetition secured creditors liens on a

debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code. Del. Bankr. L. R. 4001-2(a)(i)(D). The Interim Order provides as security for the DIP Obligations and as adequate protection for the amount of any post-petition diminution in value of Collateral, among other things and subject to the entry of a Final Order, the granting of the DIP Liens and the Adequate Protection Replacement Liens in, among other things, such Chapter 5 causes of action. Interim Order, ¶11(b).

14.    *Use of Postpetition Loans to Pay Prepetition Debt*.   Local Rule 4001- 2(a)(i)(E) requires the identification of provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code. Del. Bankr. L. R. 4001-2(a)(i)(E). While the Interim Order provides for the repayment of the Prepetition Credit Facility in full upon its entry, such payoff is being made from funds loaned to the Debtors from a lender other than the Prepetition Credit Facility Parties. Such payoff shall account for use of approximately $43 million of the total DIP Facility. The Interim Order provides for a "roll up" of $30,000,000 of the Prepetition Notes held by the DIP Lenders. Interim Order. ¶¶(a)(ii), 16-17.

15.    *Professional Fees*.   Local Rule 4001-2(a)(i)(I) requires a description of any disparate treatment of the professionals retained by an official creditors committee from those of the Debtors' Professionals. The Approved DIP Budget includes $5.380 million for the Debtors' Professionals and $500,000 for the committee's professionals. Likewise, Post-Carve Out Notice Cap includes $300,000 for the Debtors' professionals and $50,000 for the Committee's professionals. Interim Order, ¶35(a).

16.    *Equities of the Case*.   Local Rule 4001-2(a)(i)(H) requires a description of any

provisions of the proposed debtor in possession facility that seek to affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code. Subject to the entry of the Final Order, the Debtors have agreed that the "equities of the case" exception shall not apply as described above. Interim Order, ¶39. The DIP Liens and the DIP Superpriority Claims shall not be subject to the "equities of the case" exception in any event.

17.     As discussed more fully below and in the First Day Declaration, the provisions of the DIP Facility as to which disclosure is required pursuant to Local Rule 4001-2 are all justified under the circumstances of these Chapter 11 Cases. The Debtors actively solicited proposals for DIP financing from more than twenty (20) lenders and other financial institutions. Of those contacted by the Debtors' investment banking firm Jefferies LLC, twelve (12) parties requested non-disclosure agreements, and five (5) parties signed such agreements and conducted due diligence. Ultimately, four (4) DIP financing proposals were received, including proposals from Wells Fargo and the Ad Hoc Committee of Prepetition Noteholders (defined below) ("Ad Hoc Committee"). Although certain aspects of the DIP financing proposal made by the Ad Hoc Committee were more expensive than the proposal made by Wells Fargo (but were otherwise more favorable and less expensive than the other two proposals), the Ad Hoc Committee's proposal is an integral component of, and foundation for, a Chapter 11 plan of reorganization sponsored by an affiliate of Spencer Spirit Holdings and supported by a majority of the Prepetition Noteholders. Facilitating a comprehensive restructuring of the Debtors was a feature that no other DIP Lender could offer. For that reason, the Debtors submit that they were unable to obtain financing on more favorable terms (or one that would offer the global solution that is provided hereunder) from sources other than the DIP Lenders, and without such financing, the Debtors' ability to successfully consummate a reorganization would be jeopardized. The

Debtors thus respectfully submit that the facts and circumstances of these Chapter 11 Cases demonstrate that the above-described provisions, which are set forth in greater detail below, are necessary and appropriate and should be authorized and approved by this Court.

### Relief Requested

18.     By this Motion, the Debtors seek entry of the DIP Orders, <u>inter alia</u>:

(i)     under sections 363, 364(c), and 364(d) of the Bankruptcy Code, authorizing the Debtors, as borrowers, to obtain senior secured superpriority priming debtor in possession financing under the terms and conditions of the DIP Credit Agreement and the other DIP Loan Documents, consisting of a loan facility in an aggregate amount of $96.25 million from the DIP Lenders, and authorizing the Debtors to enter into and comply in all respects with the DIP Loan Documents, and approving the terms and conditions of the DIP Documents;

(ii)    under sections 363 and 364 of the Bankruptcy Code, authorizing the Debtors to use the proceeds of the DIP Facility in a manner consistent with the terms and conditions of the DIP Documents, and in accordance with the Approved DIP Budget, (i) repay in full in cash the Prepetition Secured Debt owed to Wells Fargo upon entry of the Interim Order, (i) repay $30.00 million in cash of the prepetition amounts owed to Prepetition Noteholders upon entry of the Interim Order, (iii) pay fees and expenses related to DIP Documents and the DIP Facility, and (iv) fund working capital in the ordinary course of business of the Debtors (and out of the ordinary course as approved by the DIP Agent, the Required DIP Lenders and the Court to the extent set forth in the Approved DIP Budget);

(iii)   under sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as security for the repayment of the borrowings and all other obligations arising under the DIP Documents, authorizing the Debtors to grant to the DIP Lenders first priority priming, valid, perfected, and enforceable liens, subject to certain exceptions, including the Carve-Out, on substantially all of the Debtors' assets, as generally described below and as set forth more fully in the Interim Order, the DIP Credit Agreement, and the other DIP Documents;

(iv)    under section 364(c)(1) of the Bankruptcy Code, granting in favor of the DIP Lenders, the DIP Superpriority Claims in respect of the DIP Obligations, subject to certain exceptions, including the Carve-Out;

(v)     under sections 361, 363(c)(2), and 363(e) of the Bankruptcy Code, authorizing the use of Cash Collateral by the Debtors, in accordance with

the Approved DIP Budget, and under the terms set forth in the DIP Orders;

(vi)     under sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, authorizing the granting to the Prepetition Secured Parties, of the Adequate Protection Replacement Liens, and Adequate Protection Superpriority Claims to the extent of any Diminution in Value of the Prepetition Secured Parties' interests in the Prepetition Collateral on account of the Prepetition Secured Debt, and having the priorities set forth in the Orders; as well as additional adequate protection in the form of the payment of fees and expenses incurred by the Prepetition Secured Parties in connection with the Prepetition Secured Credit Agreement;

(vii)    under section 362 of the Bankruptcy Code, modifying the automatic stay to the extent necessary to implement and effectuate the terms and provisions of the Orders, the DIP Credit Agreement, and the other DIP Documents, including upon the occurrence and during the continuance of an Event of Default, to exercise all rights and remedies in the DIP Credit Agreement as set forth in the Interim Order;

(viii)   scheduling the Final Hearing no later than thirty (30) days from entry of the Interim Order to consider entry of the Final Order granting the relief requested in the Motion on a final basis, including final approval of the Debtors' use of Cash Collateral and entry into the DIP Credit Agreement, and approving the form of notice with respect to the Final Hearing;

(ix)     subject to the entry of the Final Order, waiving any right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; and

(x)      waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for the immediate effectiveness of the Orders.

## THE DEBTORS' IMMEDIATE NEED FOR FINANCING AND USE OF CASH COLLATERAL

19.     The Debtors have an immediate and critical need to obtain entry of the Interim Order, use Cash Collateral and to obtain credit pursuant to the DIP Facility in order to, among other things, continue to operate their businesses and the preserve the going concern value of their estates. The DIP Facility will provide the Debtors with sufficient liquidity to fund working capital and general corporate requirements, in accordance with the Approved DIP Budget, to preserve and maintain the value of the Debtors' assets, and to fund the restructuring efforts,

which contemplate the sale of the Debtors as going concerns for the benefit of the Debtors' estates, customers, vendors, employees, and creditors, including the Prepetition Secured Lenders. If the Debtors are unable to obtain approval of the proposed DIP Facility and use of Cash Collateral on an interim and final basis, they will not have sufficient liquidity in order to maintain day-to-day operations and pay employees and vendors on a timely basis causing a substantial loss of asset value to the detriment of all parties in interest, and jeopardizing their ability to confirm a plan and consummate the underlying restructuring transaction.

20.    Moreover, interim and final approval of the DIP Facility will enable the Debtors to demonstrate to their customers, employees and vendors, that the businesses will continue without interruption, that the Debtors will have adequate working capital and that the Debtors will continue to perform their obligations in the ordinary course during this restructuring. Absent approval of the DIP Facility -- and in the event of any interruption or delay in the performance of the Debtors' obligation -- the Debtors' retail operations would immediately cease to function and current and future customers will likely shop elsewhere. Thus, without the DIP Facility, the Debtors' businesses would be crippled and reorganization would not be possible.

21.    The immediate repayment of the Prepetition Credit Facility and the establishment of the Prepetition Credit Facility Reimbursement Account in accordance with the terms of the proposed Interim Order is necessary, as the Prepetition Credit Facility Parties have not consented to the use of their Cash Collateral or the subordination of their Prepetition Credit Facility Liens to the DIP Liens on terms other than those proposed in the DIP Facility. The Debtors submit that they and their estates will not be prejudiced because the payment of such amounts is subject to "challenge" rights set forth in paragraph 36 of the proposed Interim Order.

22.    The DIP Facility was negotiated at arm's length and in good faith and is an

integral component of the Debtors' pre-negotiated reorganization which has the support of a committed plan sponsor and the Ad Hoc Committee.  The Debtors have diligently sought and are unable to obtain financing on more favorable terms from sources, particularly in light of the DIP Lenders' support for the Debtors' proposed restructuring.  For substantially the same reasons, the Debtors are unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2) and 364(c)(3) without also granting to the DIP Agent and the DIP Lenders, (i) the DIP Liens, including the priming of the Prepetition Note Liens, and the DIP Superpriority Claims under the terms and conditions set forth in the proposed Interim Order and in the DIP Documents, and (ii) the other protections set forth in the proposed Interim Order and without this Court's authorization of the Roll-Up Amount pursuant to the terms of the proposed Interim Order and the DIP Documents.  The Roll-Up DIP Loans are a necessary inducement to, and a portion of the compensation for, the DIP Lenders providing the DIP Facility and the commitment to support the Debtors' plan.

23.     Thus, entry of the Interim Order (a) will avoid irreparable harm to the Debtors, their creditors, assets, businesses, goodwill, reputation, customers, and employees, (b) is critical to the Debtors' ability to continue to operate and maximize value, and (c) is the best interests of the Debtors and their estates.

## BASIS FOR RELIEF

### A.    The Debtors' Entry into the DIP Facility Is Authorized Under Section 364 of the Bankruptcy Code

24.     Section 364 of the Bankruptcy Code gives bankruptcy courts the power to authorize postpetition financing for a chapter 11 debtor in possession.  *See In re CB Holding Corp.*, 447 B.R. 222, 226 (Bankr. D. Del. 2010) (authorizing debtor-in-possession postpetition financing); *In re Questex Media Grp., Inc.*, 09-13423(MFW), 2009 WL 7215695, at *7 (Bankr.

D. Del. Oct. 26, 2009) (authorizing postpetition financing); *see also In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991), *aff'd*, 145 B.R. 312 (B.A.P. 9th Cir. 1992).

      25.    Bankruptcy courts have the power to authorize secured postpetition financing under section 364 of the Bankruptcy Code, which provides, in pertinent part, as follows:

> (c)    If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> > (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3)    secured by a junior lien on property of the estate that is subject to a lien.
>
> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> > (A)    the [debtor in possession] is unable to obtain such credit otherwise; and
> >
> > (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(c)-(d)(1).

      26.    "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide `incentives to the creditor to extend post-petition credit." *Defender Drug Stores*, 126 BR. at 81 (quoting *Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 603 (6th Cir. 1987), *cert. denied*, 488 U.S. 817 (1988)). The incentives enumerated in section 364 are not intended to be an exhaustive list of the inducements that a court may grant. *Id.* In fact, it is not uncommon for a court to approve a lending arrangement

containing terms that far exceed those authorized by section 364. *Id.*

27.    Generally, courts apply a three-part test to determine whether a debtor in possession may obtain credit under section 364(c) of the Bankruptcy Code. Under such test, the Debtors may incur postpetition financing under the DIP Facility pursuant to section 364(c) if they demonstrate that (a) they cannot obtain credit unencumbered or without superpriority status, (b) the DIP Facility is necessary to preserve the assets of their estates, and (c) the terms of the DIP Facility are fair, reasonable, and adequate given the circumstances of the Debtors, as Borrower and Guarantors, and the DIP Lenders. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (setting forth the elements above); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549- 50 (Bankr. E.D. Pa. 1987); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D Pa. 1991).

28.    In addition, section 364(d)(1) of the Bankruptcy Code authorizes a debtor in possession to incur superpriority senior secured debtor or "priming" liens if (a) the debtor is unable to obtain financing from another source and (b) the interests of the secured creditors whose liens are being primed by the postpetition financing are adequately protected. 11 U.S.C. § 364(d)(1); *In re Satcon Tech. Corp.*, 12-12869 KG, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (applying § 364(d)(1) and finding adequate protection); *see also Aqua Assocs.*, 123 B.R. at 196.  Importantly, consent by the secured creditors to priming can obviate the need to show adequate protection. *See Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

29.    Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (i) the Prepetition Secured

Parties have consented to those liens or (ii) the Prepetition Secured Parties' interests in the collateral are adequately protected.

30.     Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case and accord significant weight to the necessity for obtaining the financing. *See, e.g., Satcon*, 2012 WL 6091160, at *6 (noting that adequate protection is evaluated on a "case-by-case basis"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990). Debtors in possession are generally permitted to exercise their basic business judgment consistent with their fiduciary duties when evaluating the necessity of proposed protections for a party extending credit under section 364 of the Bankruptcy Code. *See, e.g., In re Coda Holdings, Inc.*, 13-11153 (CSS), 2013 WL 6840242, at *8 (Bankr. D. Del. May 3, 2013) (allowing the debtors' business judgment to govern section 364 postpetition financing procedures and protections); *Ames*, 11 B.R. at 38.

(i)     The Debtors are Unable to Obtain Unsecured or Junior Secured Credit

31.     To show that the credit required is not obtainable on an unsecured basis, the Debtors need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to the DIP Secured Parties by section 364(c) or (d) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Anchor Sav. Bank*, 99 B.R. at 120 n.4 (noting that the debtor satisfied the requirement of section 364(d) by "approach[ing] all lenders reasonably likely to be willing to make a junior or unsecured loan"); *Ames*, 115 B.R. at 37-40 (debtor in possession must show that it has made a reasonable effort to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Snowshoe*, 789 F.2d at 1088; *see also In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1998) (finding that "it would be

unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing" where the debtor "suffers some financial stress and has little or no unencumbered property"), *aff'd sub nom., Anchor Sav. Bank*, 99 B.R. at 117.

32.     As discussed above and in the First Day Declaration, substantially all of the Debtors' assets other than its retail leases and its headquarters property are subject to the liens held by the Prepetition Secured Parties. Because of the Debtors' prepetition debt, obtaining the financing needed as unsecured debt on an administrative priority basis, or as debt which would be secured solely by liens junior to the liens of the Prepetition Secured Parties, was not a viable option, especially from a third party who did not already have a financial interest in the Debtors to protect. The Prepetition Secured Parties did not consent, however, to the granting of senior or *pari passu* liens to a new third party debtor in possession lender. More importantly, the DIP Lenders provide something no other Lender could make available, that is, a commitment to support a reorganization under a pre-negotiated Chapter 11 plan. The Debtors have, therefore, concluded that adequate alternative financing terms more favorable than those to be provided by the DIP Lenders under the DIP Facility are currently unobtainable.

(ii)     The Prepetition Secured Parties' Interests in the Prepetition Collateral Are Adequately Protected

33.     If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien (*i.e.,* a priming lien). *See* 11 U.S.C. § 364(d). Such relief may be granted so long as there is adequate protection of the secured creditor's interests in the property on which the senior lien is supposed to be granted. *See id.; see also Satcon*, 2012 WL 6091160, at *5-6; *Aqu*a, 123 B.R. at 196. Although the Bankruptcy Code does not explicitly define "adequate protection," section 361 of the Bankruptcy Code provides that it may take the

form of (1) a cash payment or periodic cash payments to the extent that there is a decrease in the lien holder's property interest; (2) an additional or replacement lien to the extent that there is a decrease in the lien holder's property interest; or (3) such other relief that will result in a secured party's realizing the indubitable equivalent of its property interest. *See* 11 U.S.C. § 361.

34.    When a debtor's proposed use of funds from additional postpetition financing augments the value of the secured creditor's collateral, adequate protection exists. *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 566 (3d Cir. 1994) (recognizing increase in value of collateral as possible adequate protection, but finding no increase in value in the particular case); *Sky Valley*, 100 B.R. at 114 (noting the flexible nature of section 361(3) and collecting cases). The Debtors believe that the measures of protection set forth in the DIP Facility and the Interim Order constitute adequate protection. In addition to replacement liens on substantially all assets, junior in priority only to the DIP Liens and any existing senior liens (and subject to the Carve-Out), the Prepetition Secured Parties will receive superpriority administrative expense claims, and reasonable professional fees and expenses incurred by the Prepetition Secured Parties in connection with the Prepetition Secured Credit Agreement. Moreover, the use of any DIP Facility proceeds and other cash shall be solely in accordance with the Approved DIP Budget. Accordingly, the DIP Facility not only maintains the value of the collateral in which the Prepetition Secured Parties are receiving replacement liens, it also could increase the collateral base and strengthen the value of the Debtors' businesses.

35.    Finally, as mentioned above, consent may take the place of adequate protection under section 364(d)(1) of the Bankruptcy Code, and the Debtors have obtained the consent of the Prepetition Secured Parties to use the Cash Collateral and enter into the DIP Facility, but only subject to and on the terms set forth in the DIP Orders.

(iii)    The DIP Facility Is Fair, Reasonable, and in the Best Interests of the Estate

36.    The Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable. The DIP Facility is necessary to support the Debtors' ongoing operations, allowing the Debtors to signal to stakeholders the Debtors' continued ability to compete in the marketplace. The DIP Facility will also facilitate the continued support of the Debtors' customers, employees, landlords and critical suppliers. Furthermore, as is more fully explained in the First Day Declaration, the Debtors, with the assistance of their advisors, undertook an effort to obtain the best available terms for debtor in possession financing. Based upon these efforts, the interest rates at respectively 5.5% on up to $60 million in debt and 0.3% on $36.25 million in debt, the fees, and other terms of the DIP Facility -- when combined with a commitment to support a pre-negotiated Chapter 11 plan -- are superior in the Debtors' business judgment, to all other financing proposals received by the Debtors and the DIP Facility is, therefore, the best financing option available to the Debtors. The Debtors believe that the proposed DIP Facility, in context, is an extraordinary opportunity for the Debtors, their estates and the creditors and is in fact the best financing available and well within the exercise of the Debtors' exercise of its sound business judgment.

37.    Bankruptcy courts regularly defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 BR. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment ... [were] reasonable under the circumstances and in the best interests [of the debtor] and its creditors"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("In exercising [the debtor's] business judgment of conducting its drilling operations, it has found it

necessary to obtain loans to make these endeavors possible."). In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Los Angeles Dodgers*, 457 B.R. at 313 (noting that "courts will almost always defer to the business judgment of a debtor in the selection of the lender" and other matters); *Simasko Prod.*, 47 B.R. at 449 ("Business judgments should be left to the board room and not to this Court.") (quoting *In re Lifeguard Indus. Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983)). Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to accept and enter into the proposed DIP Facility.

38.    Moreover, the Debtors have made a concerted good faith effort to obtain credit on the most favorable terms available. The DIP Facility was ultimately determined to provide the requisite liquidity on the most advantageous terms given that the Prepetition Secured Parties expressed their lack of consent to a senior or *pari passu* third party debtor in possession lender. Absent such consent, distracting and costly litigation over the propriety of any priming or *pari passu* third party debtor in possession financing would likely have ensued, with potentially severe consequences for the Debtors, their estates, creditors, employees, and other parties. Against this backdrop, the Debtors carefully evaluated the proposed financing structure from the DIP Lenders, engaged in negotiations with the DIP Lenders regarding the proposed terms, and eventually agreed to the DIP Lenders' proposal as the proposal best suited to the Debtors' needs.

39.    The terms and conditions of the DIP Facility were negotiated by the parties (and their legal and financial advisors) in good faith and at arms' length and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in

chapter 11, to preserve the Debtors as a going concern and to preserve value of the Prepetition Collateral. Accordingly, the DIP Lenders should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility are later modified, vacated, stayed, or terminated by subsequent order of this or any other Court, the DIP Lenders will be fully protected with respect to any amounts previously disbursed.

**B.    The Use of Cash Collateral Is Appropriate Under the Current Circumstances and Should Be Authorized**

40.    The Court should authorize the Debtors to use Cash Collateral, whether existing as of the Petition Date or arising thereafter based on the conversion of existing non-cash collateral into cash, on the terms and conditions set forth in the Interim Order. It is essential to the continued operation of the Debtors that they obtain authority to use Cash Collateral to fund payroll and other operating needs, including the costs of administration of these Chapter 11 Cases. Currently, the Debtors have little or no available cash or assets readily convertible into cash that are not subject to the Prepetition Secured Parties' liens and security interests.

41.    If the Debtors are permitted to use Cash Collateral to fund ongoing business operations and administration of these Chapter 11 Cases, the Debtors will preserve the value of the Debtors' assets as a going concern. Thus, the Debtors can continue to run their businesses successfully, but only if they are allowed to use Cash Collateral in the course of the day-to-day operations. Without such use, the detrimental result to the value of the estate will be rapid and ultimately disastrous, given the nature of the Debtors' businesses. Access to Cash Collateral is crucial to the Debtors' ability to avoid immediate and irreparable harm to the value of their estates, creditors, employees, and ongoing businesses both before and after the Final Hearing.

42.    Section 363(c)(2) of the Bankruptcy Code sets forth the requirements for a debtor's proposed use of cash collateral. Specifically, section 363(c)(2) provides, in pertinent

part:

> The trustee [or debtor in possession] may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless — (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2). Additionally, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

43.     The Debtors respectfully submit that the proposed use of Cash Collateral, in conjunction with the DIP Facility, is necessary for the Debtors to have sufficient liquidity during the chapter 11 process to preserve the value of their assets and property (including the Prepetition Collateral). The Debtors' proposed use of Cash Collateral thus should prejudice no one; it affirmatively and directly benefits the Debtors' estates and creditors, including the Prepetition Secured Lenders, and enhances the prospects of a successful outcome in these Chapter 11 Cases.

### C.     The Proposed Adequate Protection for the Use of Cash Collateral Is Appropriate

44.     In considering whether to authorize use of cash collateral, a court generally must find that the interests of the holder of the secured claim are adequately protected. *See* 11 U.S.C. § 363(e). Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property ... proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). The Debtors' use of Cash Collateral is conditioned upon adequate protection being provided to the Prepetition Secured Parties, as set forth in the DIP Orders.

45.     The Prepetition Secured Lenders' primary form of adequate protection will be the Debtors' use of Cash Collateral and the DIP Facility to preserve the going concern value of the Debtors' assets and solely in accordance with the Approved DIP Budget.  Courts have held that adequate protection may be demonstrated by a showing that the going concern value of the debtor is preserved by the debtor's continuing operations and use of cash collateral.  *See, e.g., In re Snowshoe Co., Inc.,* 789 F.2d at 1087-89 (trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased operations).  Additionally, as mentioned above, the Debtors will be granting replacement liens and superpriority claims as adequate protection, which is commonplace.  *See, e.g., Satcon,* 2012 WL 6091160, at \*7 (noting that debtors would provide replacement liens as adequate protection); *MBank Dallas N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1396-98 (10th Cir. 1987) (allowing the debtor to replace a lien on cash with a lien on property likely to be worth five times as much); *Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale, Inc.),* 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtor would likely constitute adequate protection for the secured creditor); *Wrecclesham Grange,* 221 B.R. at 981) (noting that a replacement lien of equal value on postpetition rents is adequate protection); *In re Stein,* 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982) (continued lien on debtors' crops, livestock, and equipment resulted in an increase rather than a decrease in collateral, and debtors were granted authority to use cash collateral to meet operating expenses during chapter 11 proceedings).

46.     For the foregoing reasons, the Debtors respectfully submit that the adequate protection contemplated herein (described in more detail above) and in the DIP Orders is appropriate and should be approved.

### Request for a Final Hearing

47.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors respectfully request that the

Court set a date for the Final Hearing no later than thirty (30) days from entry of the Interim Order and approve the provisions for notice of the Final Hearing and the objection procedures that are set forth in Paragraph 50 of the proposed Interim Order.

## THE NEED FOR IMMEDIATE RELIEF PENDING A FINAL HEARING

48.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion for authorization to use cash collateral may not be commenced earlier than fourteen (14) days after service of such motion. Fed. R. Bankr. P. 4001(b)(2). Upon request, however, the Court may conduct a preliminary expedited hearing on a motion and authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing, based on the business exigencies of individual cases. *See id.* The Debtors submit that, for the reasons set forth herein, authority to use Cash Collateral on an interim basis as requested in the Motion is critical to enable the Debtors to maintain ongoing operations pending a sale of substantially all of the Debtors' assets in these Chapter 11 Cases.

## WAIVER OF BANKRUPTCY RULES 6004(A) AND (H)

49.     Should the Court grant the Motion and enter the DIP Orders, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

50.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' creditors holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (c) counsel to the agent for the Debtors' proposed postpetition financing facility; (d) counsel to the agent for the Debtors' prepetition secured credit facility; (e) counsel to the indenture trustee for the Debtors' prepetition senior secured notes; (f) the Internal Revenue Service; (g) the United

States Department of Justice and (i) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002. In light of the nature of relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

## NO PRIOR REQUEST

51.    No prior motion for the relief requested herein has been filed in this or any other court.

*[Remainder of Page Left Blank Intentionally]*

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that this Court enter the Interim Order, substantially in the form attached hereto, (a) granting the relief requested herein and (b) granting such other and further relief as is just and proper.

Dated: *April 3, 2014*
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Tel:    (302) 467-4400
Fax    (302) 467-4450
Email: landis@lrclaw.com
         mumford@lrclaw.com
         brown@lrclaw.com

and

**K&L GATES LLP**

Charles A. Dale III
Mackenzie L. Shea
One Lincoln Street
Boston, Massachusetts 02111
Tel:    (617) 261-3100
Fax:    (617) 261-3175
Email: chad.dale@klgates.com
         mackenzie.shea@klgates.com

*Proposed Counsel to the Debtors and Debtors-in-Possession*