# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BROOKSTONE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10752 (____) |
| Debtors. | (Joint Administration Requested) |

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF KEY EMPLOYEE RETENTION PLAN AND KEY EMPLOYEE INCENTIVE PLAN

The above-captioned debtors and debtors-in-possession (the "Debtors") by and through their proposed undersigned counsel, hereby submit this *Motion of the Debtors for Entry of an Order Authorizing Implementation of Key Employee Retention Plan and Key Employee Incentive Plan* (the "Motion"). In support of the Motion, the Debtors rely on the *Declaration of James Speltz in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"),[2] as well as the *Declaration of Adam Suttin in Support of Motion of the Debtors for Entry of an Order Authorizing Implementation of Key Employee Retention Plan and Key Employee Incentive Plan* (the "Suttin Declaration"), which will be filed as **Exhibit 2**, and respectfully represent and set forth as follows:

### JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are:  Brookstone Holdings Corp. (4638), Brookstone, Inc. (2895), Brookstone Company, Inc. (3478), Brookstone Retail Puerto Rico, Inc. (5552), Brookstone International Holdings, Inc. (8382), Brookstone Purchasing, Inc. (2514), Brookstone Stores, Inc. (2513), Gardeners Eden, Inc. (7793), Brookstone Military Sales, Inc. (2029), Big Blue Audio LLC (N/A), Brookstone Holdings, Inc. (2515); and, Brookstone Properties, Inc. (2517).  The Debtors' corporate headquarters and the mailing address for each Debtor is One Innovation Way, Merrimack, NH 03054.

[2] Except where otherwise indicated, capitalized terms used but not defined in this Motion have the meanings ascribed to them in the First Day Declaration.

Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.[3] Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are sections 105(a), 363 and 503(c)(3) of chapter 11 of the United States Code (the "Bankruptcy Code").

## GENERAL BACKGROUND

3.     On the date hereof (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Court.

4.     The Debtors continue to operate their business and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date of this Motion, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases.

5.     A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Chapter 11 Cases, are set forth in greater detail in the First Day Declaration, filed contemporaneously herewith and incorporated herein by reference.

## RELIEF REQUESTED

6.     By this Motion, the Debtors seek entry of an order, substantially in the form of the proposed order attached hereto, authorizing the implementation of a key employee incentive plan

---

[3] Pursuant to Local Rule 9013-1(f), the Debtors hereby confirm their consent to entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

(the "KEIP") and a key employee retention plan (the "KERP", and together with the KEIP, the "Employee Compensation Plans").

## THE EMPLOYEE COMPENSATION PLANS

**A.    The KERP**

7.    The Debtors seek authorization to implement the KERP and retain thirty-three (33) employees (the "Key Employees") who are critical to the Debtors' ongoing operations during these Chapter 11 Cases.  These Key Employees play significant roles in numerous facets of the Debtors' business and are necessary to the continued operation thereof.  More importantly, these Key Employees are not officers or directors of the Debtors, and thus do not constitute "corporate insiders."  The KERP is more fully described in the attached **Exhibit 1** and **Schedule B**[4] thereto, as well as in the Suttin Declaration.

8.    The KERP affords these Key Employees potential bonuses ranging from 17% to 50% of their base salary.  The value of the bonuses ranges from $8,552.00 to $95,000.00, for a total of $1,282,429.00.  Fifty percent (50%) of the KERP bonus will be paid upon consummation of the sale of the Debtors' business, and the balance will be paid sixty days after consummation of such sale.

9.    If, after a sale, the KERP participants are not hired by the buyer, the KERP participants will be eligible to receive the greater of the KERP bonus or a severance benefit, but not both.  The severance benefit consists of two weeks pay of the eligible employee's salary plus an additional week's pay for each full year of service with the Debtors, for a maximum of 20 weeks.

---

[4] The Debtors have moved to file under seal **Schedule B** to **Exhibit 1**.

10. If, however, the Key Employees resign or are terminated for cause before a sale is consummated, they will forfeit the KERP bonus and the severance benefit. Participation in the KERP also requires the Key Employees to release the Debtors of any claims or potential claims they may have against the Debtors.

11. The Debtors conducted significant due diligence in identifying the needs for and designing the KERP. For example, the Debtors' board of directors vetted the KERP at several meetings, and they only approved the KERP after extensive analysis and discussion by their members and the Debtors' professional advisors. The Debtors' investment banker, financial advisor and counsel advised the Debtors about the necessity and propriety of the KERP, as well as its comparison to other chapter 11 cases. The board of directors ensured that the terms of the KERP were similar to those previously approved by bankruptcy courts. The details of the KERP were shared with and approved by key constituents of the Debtors, including the Debtors' senior secured lender, Wells Fargo.

12. The Debtors also worked diligently in identifying the appropriate personnel to participate in the KERP, especially because the Debtors had experienced departures from several key personnel members. The Key Employees were selected because of their unique operational and historical knowledge of the business and the vital role they play in the daily operations of the various aspects of the Debtors' business. Without the KERP, many Key Employees would leave the Debtors to find employment elsewhere. In their absence, an information and leadership vacuum would result and the Debtors' operations would significantly suffer. These Key Employees would be difficult and expensive to replace. Even assuming that these Key Employees can be replaced, training new hires would be costly and time consuming, thereby

detracting the Debtors' energy and efforts from operating their business and advancing these Chapter 11 Cases.

      13.    The Debtors selected employees from the following departments to participate in the KERP:

    a.    **Certain members of the E-Commerce team (the "E-Commerce Members").** The Debtors derive a large share of their revenue from internet sales. The E-Commerce Members will continue to ensure that the Debtors' online presence and related sales continue to thrive so as to maximize revenue. The Debtors' E-Commerce operations are intricate and the E-Commerce Members are best suited to oversee and run them.

    b.    **Certain members of the Finance department (the "Finance Members").** The Finance Members are necessary to preserve the financial well-being of the Debtors, by overseeing accounts payables and receivables and ensuring the Debtors' liquidity and compliance with the Debtor-in-Possession Budget. The Debtors' financial system is complex and its operation cannot simply be assigned to other individuals lacking that institutional knowledge.

    c.    **Certain members of the Information Technology department (the "IT Members").** The Debtors operate a large and interconnected network of stores, distribution centers and online systems. The proper functioning of the Debtors' IT is critical to the operation of every aspect of the Debtors' business. These IT Members are experts in their fields, have intimate knowledge about the Debtors' IT, and are best-suited to address any IT needs or issues that may arise.

    d.    **Certain members of Store Operations team (the "Store Operations Members").** A significant source of the Debtors' revenue is derived from in-store sales. Indeed, 52% of store profitability for Fiscal 2013 was generated from the Debtors' stores. The Store Operations Members will ensure that the Debtors' stores continue to generate sales, meet customer demands in a professional manner, and maintain relationships with vendors, landlords and other service providers. The Store Operations Members play important roles in communicating internally within the organization and externally with the general market place. Without them, store operations would suffer and sales may decline.

    e.    **Certain members of the Creative Services team (the "Creative Services Members").** The Creative Services Members play important roles in marketing the Debtors' merchandise and conducting in-store

presentations. Their services place the Debtors in the best position to advertise and market their products for sale.

f.     **Certain members of the Merchandising and Product Development departments (the "Merchandising Members").** As a retail business, the Debtors' ability to develop, acquire, market and sell goods is critical to their revenue. The Merchandising Members oversee and ensure the flow and sale of merchandise, as well as maintain product and brand integrity. These employees have great knowledge about the Debtors' products and will ensure that the Debtors maximize their sale efforts during these Chapter 11 Cases by preserving a major asset of the Debtors -- their brand.

g.     **Certain members of the Legal and Human Resources departments (the "Legal/HR Members").** The Legal/HR Members are necessary to assist outside counsel in the filing and advancement of these Chapter 11 Cases. The Debtors anticipate that the filing of these Chapter 11 Cases will cause personnel turnover. The Legal/Human Resources Members will be vitally important in addressing issues caused by such turnover. They will also manage employment and legal issues that the Debtors will face during these Chapter 11 Cases.

h.     **Certain members of the Distribution Center (the "Distribution Members").** The Debtors maintain a complex distribution network and receive and deliver goods from all over the country and world. The ability to acquire products and deliver them to the Debtors' stores and their customers will be crucially important in generating sales. These Distribution Members are also invaluable because of their relationships with carriers and other agents that the Debtors utilize to acquire, process, and deliver goods.

Because the Key Employees play such critical roles in every aspect of the Debtors' operations, the Debtors' business would greatly benefit by their retention. More importantly, losing these Key Employees would significantly harm the Debtors' business as any potential replacements will be difficult to target and retain, will yield substantial training costs, and will be less effective due to the natural learning curve that they will encounter.

14.    Ultimately, the Debtors' board determined that the KERP was necessary to maintain stability, allay fears related to the Debtors' financial performance and maximize value for the creditors.

**B.**    **The KEIP**

15.    The Debtors also seek authorization to implement the KEIP for four of their key executives (the "Key Executives"), who are critical to the Debtors' operations during these Chapter 11 Cases.

16.    The KEIP is purely an incentive, and not retention, based compensation plan that rewards these Key Executives only if the Debtors achieve certain operational and financial benchmarks that are directly related to the preservation and maximization of the value of the Debtors' business.  The details of the KEIP are described more fully in the attached **Exhibit 1** and **Schedule A**[5] thereto, as well as in the Suttin Declaration.

17.    The KEIP proposes a two-component bonus structure that incentivizes the Executives to (1) obtain the highest and best terms for any proposed transaction involving a sale of the Debtors' business, and (2) preserve the value of the Debtors' estates by increasing their liquidity and maintaining a positive operating cash flow.

18.    Fifty percent (50%) of the KEIP bonus will be paid upon consummation of the sale of the Debtors' business, and the balance will be paid sixty (60) days after consummation of such sale.  Thus, for example, if the aggregate purchase price is estimated at approximately $147,000,000.00, as offered by the current stalking horse bidder, the four KEIP bonuses will be approximately $843,150 in total, which does not account for the liquidity component of the bonus.

19.    If, however, the Key Executives resign or are terminated for cause before a sale is consummated, they will forfeit the KEIP bonus.  Participation in the KEIP also requires the Key Executives to release the Debtors of any claims they may have against the Debtors.

---

[5] The Debtors have moved to file under seal **Schedule A** to **Exhibit 1**.

20.    The Debtors conducted significant due diligence in identifying the needs for and designing the KEIP.  For example, the Debtors' board of directors vetted the KEIP at several meetings, and they only approved the KEIP after extensive analysis and discussion by their members and the Debtors' professional advisors.  The Debtors' investment banker and counsel advised the Debtors about the necessity and propriety of the KEIP, as well as its comparison to other chapter 11 cases.  The board of directors ensured that the terms of the KEIP were similar to those previously approved by bankruptcy courts.   The Debtors' board of directors also scrutinized the terms of the KEIP at length and ensured that compensation targets were sufficiently challenging for the Key Executives.  The details of the KEIP were shared with and approved by key constituents of the Debtors, including the Debtors' senior secured lender, Wells Fargo.

21.    The Debtors also worked diligently in identifying the appropriate personnel to participate in the KEIP.  The Key Executives were selected because of their unique operational and historical knowledge of the business which will enable them to best operate the Debtors' business and to obtain the highest possible value for the Debtors' assets.  These Key Executives are highly accomplished and capable officers and possess invaluable knowledge about the Debtors' operational, financial and legal affairs.   Among them, the Key Executives have approximately fifty-five years of experience in managing the Debtors' business.

22.    The Key Executives were also selected to participate in the KEIP because, prior to the Petition Date, they assumed significant additional responsibilities and time commitments above and beyond their normal duties in order to assist the Debtors in managing their businesses and assisting with the filing of these Chapter 11 Cases.   Specifically, the Key Executives assumed the following additional responsibilities: (a) assisting the Debtors' professional advisors

in understanding the Debtors' businesses; (b) interacting with the Debtors' lenders, creditors, and potential purchasers, including responding to extensive requests and attending in-person and telephonic meetings; (c) assisting with the general preparation of the Chapter 11 Cases, such as by addressing factual inquiries from all of these constituents.

23.     Now that these Chapter 11 Cases have commenced, the Key Executives will be expected to provide, among other things, extensive and indispensable assistance to the Debtors' counsel and advisors, as well as manage the daily operations and finances of the Debtors.  The Key Executives will also help maintain good relationships with existing vendors, landlords and other parties so that the Debtors can realize and preserve the highest possible value of the business.

24.     The Debtors believe that the KEIP is appropriately designed to incentivize the Key Executives to continue their substantial efforts in operating the Debtors' businesses and assisting with these Chapter 11 Cases.  Moreover, the KEIP has been tailored as a catalyst and compensates the Key Executives for the additional (and time consuming) responsibilities that they will have to continue to perform to reach the bonus benchmarks.

### BASIS FOR RELIEF

25.     The Debtors seek authority to implement the KERP and KEIP under section 503(c)(3) of the Bankruptcy Code.  The KERP and KEIP satisfy the business judgment rule as (a) they are closely related to the Debtors' goal, (b) their costs are reasonable in light of the Debtors' assets, liabilities, and projected earnings, (c) they are fair, nondiscriminatory and customary in the chapter 11 context, particularly those related to the retail industry, and (d) they were fully vetted internally and externally by the Debtors' board of directors with assistance from outside professionals.

A.    **Governing Law**

26.    Traditionally, compensation plans were analyzed and approved under section 363 of the Bankruptcy Code, which authorizes the debtor to use, sell or lease the property of the estate. See, e.g., In re Global Home Prods., LLC, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); In re Nobex Corp., 2006 Bankr. LEXIS 417, at *7 (Bankr. D. Del. Jan. 19, 2006) (approving incentive pay outside of ordinary course where it was "an appropriate exercise of the Debtor's business judgment."); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153-55 (D. Del. 1999) (affirming bankruptcy court approval of key employee retention program; stating that "[i]n determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"). If such use, sale or lease is conducted outside the ordinary course of business, the debtor's transaction must satisfy the business judgment rule. See In re Del. & Hudson R.R. Co., 124 B.R. 169, 176 (D. Del. 1991) (explaining that the Third Circuit has adopted the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

27.    In 2005, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act (the "BAPCPA"), which inserted section 503(c) into the Bankruptcy Code and restricted retention-based payments to corporate insiders. See S. 256, 109th Cong. (2005); H.R. 685, 109th Cong. (2005); see also In re Global Home Prods., LLC, 369 B.R. at 784 (recounting purpose of BAPCPA). Thus, if a proposed compensation plan is purely motivated by retaining a corporate insider, it will have to comply with the rigid requirements of section 503(c)(1). See In re Nellson Nutraceutical, Inc., 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that section

503(c)(1) applies only to retention programs with "the primary purpose of inducing [an employee] to remain with the debtor's business."). On the other hand, incentive-based compensation plans made to such insiders (or other payments made to non-insiders), outside the ordinary course, are approved under section 503(c)(3) if they satisfy the business judgment rule. See id. at 803-804; see also In re Dana Corp., 358 B.R. 567, 574 (Bankr. S.D.N.Y. 2006).

        28.     In assessing whether a proposed compensation plan satisfies section 503(c)(3) and the business judgment rule, courts consider the following factors:

- Is there a reasonable relationship between the plan proposed and the results to be obtained?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable, such that it does not discriminate unfairly?

- Is the KEIP/KERP consistent with industry standards and practices?

- What due diligence did the debtor conduct in determining that there is a need for a KEIP/KERP and in selecting the employees eligible under the proposed KEIP/KERP, in light of what is available and applicable in the industry?

- Did the debtor receive independent counsel in performing this due diligence, and in crafting and authorizing the KEIP/KERP?

In re Dana Corp., 358 B.R. at 574. See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) when there is legitimate business justification).

     **A.**     **The KERP Is Authorized Under Section 503(c)(3) Because It Does not Confer Any Benefits to Corporate Insiders and Satisfies the Business Judgment Rule**

        29.     The Court should approve the KERP because it satisfies the business judgment test of section 503(c)(3) of the Bankruptcy Code. Section 503(c)(3) is applicable because the KERP does not benefit any corporate insiders. See In re Nellson Nutraceutical, Inc., 369 B.R. at

801 ("[S]ection 503(c)(1) only applies to transfers to 'insiders,' which includes the directors and officers of the Debtors."). Indeed, none of the Key Employees are officers or directors of the Debtors.

30.     Applying the business judgment test factors expounded above, the KERP should be approved because it is reasonably related and necessary to the operational and financial stability of the Debtors' business. The KERP will ensure that the Key Employees will continue to manage the Debtors' affairs and run their business. The Key Employees hold critical positions throughout the Debtors' business and their absence would significantly impair operations and reduce the value of the Debtors' estate.

31.     Moreover, the cost of funding the KERP is reasonable when considering the losses that the Debtors would suffer without the Key Employees. Even if the Key Employees can be replaced, the Debtors would incur substantial hiring and training costs and the replacements would face a significant learning curve. Accordingly, the cost of retaining these Key Employees pales in comparison to the losses caused by their absence.

32.     Additionally, the KERP will be administered fairly among, without discriminating against any of, the Key Employees. While some employees will not be eligible for the KERP, that is so because the Debtors determined, after applying their business judgment, that only certain Key Employees need to be retained as critical members of their operations.

33.     Furthermore, the KERP underwent a thorough vetting process and its implementation was guided by outside financial and legal professionals.

34.     More significantly, courts of this District have granted similar relief to that requested herein. See Furniture Brands Int'l, Inc., Case No. 13-12329 (CSS) (Oct. 11, 2013); In re Drug Fair Group, Inc., Case No. 09-10897 (BLS) (Bankr. D. Del. May 4, 2009); In re Nortel

Networks Inc., Case No. 09-10138 (KG), Dkt. Nos. 436 & 511 (Bankr. D. Del. Mar. 5 & 20, 2009).

35.     Therefore, the Court should approve the KERP under section 503(c)(3) of the Bankruptcy Code because it satisfies the business judgment rule.

**B.      The KEIP Is Authorized Under Section 503(c)(3) as an Incentive-Based Compensation Plan That Satisfies the Business Judgment Rule**

36.     The Court should also approve the proposed KEIP because it is purely an incentive-based compensation plan, and its implementation falls squarely within the Debtors' sound business judgment and satisfies section 503(c)(3) of the Bankruptcy Code.

37.     Here, the KEIP meets all of the above-listed criteria of the business judgment rule as applied under a section 503(c)(3) analysis. First, the KEIP is directly related to the Debtors' goal of selling the business during these Chapter 11 Cases because it incentivizes the Key Executives to maximize revenue, minimize costs, and preserve liquidity. The Key Executives' interest in receiving compensation is directly aligned with the interest of maximizing the value of the Debtors' business. Indeed, one component of the KEIP bonus depends on the price obtained from any sale, while the other depends on the Debtors' liquidity. These Key Executives will have to work diligently to earn the KEIP bonus and will forfeit any payouts if they voluntarily terminate their employment with the Debtors before the targeted benchmarks have been met. Similarly, the Key Executives will also forfeit any claims that they may have against the Debtors.

38.     Second, the cost of the KEIP is reasonable and can be properly supported by the Debtors in light of their assets, liabilities and earning potential. The KEIP will only cost a small fraction of the projected sale price.

39.     Third, the KEIP is fair and reasonable because it does not discriminate at all, let alone unfairly.  The KEIP applies substantially equally to its four participants and does not discriminate against other employees.  Indeed, many Key Employees will be eligible to receive compensation under the KERP.

40.     Fourth, the KEIP is also consistent with the standards and practices in the retail industry in general, and chapter 11 retail debtors in particular.  Notably, the KEIP offers a comparable compensation to what the Key Executives would have otherwise earned.

41.     Fifth, the Debtors conducted thorough due diligence by holding numerous meetings, obtaining advice from outside professionals and receiving the approval of key constituents, including their senior secured lender, Wells Fargo.

42.     Additionally, the KEIP is not a retention-based compensation plan and is thus not subject to the restrictions of section 503(c)(1) of the Bankruptcy Code.  The KEIP is an incentive-based plan that rewards its beneficiaries for achieving operational and financial results that will preserve and maximize the value of the Debtors' business for the benefit of all the stakeholders.  The KEIP does not compensate the Key Executives simply to remain in the Debtors' employ through these Chapter 11 Cases.  Accordingly, section 503(c)(1) does not apply.

43.     More importantly, targeted incentive programs such as the KEIP have been recognized and approved in this District.  See, e.g., Furniture Brands Int'l, Inc., Case No. 13-12329 (CSS) (Oct. 11, 2013); In re THQ, Inc., Case No. 12-13398 (MFW) (Bankr. D. Del. May 29, 2013); In re Real Mex Rests., Inc., Case No. 11-13122 (BLS) (Bankr. D. Del. Dec. 19, 2011); In re Eddie Bauer, Inc., Case No. 09-12099 (MFW) (Bankr. D. Del. July 22, 2009); In re Anchor

<u>Blue Retail Gr., Inc.</u>, Case No. 09-11770 (PJW) (Bankr. D. Del. June 30, 2009); <u>In re Drug Fair Group, Inc.</u>, Case No. 09-10897 (BLS) (Bankr. D. Del. May 4, 2009).

44.    Therefore, the Debtors believe that the KEIP satisfies the business judgment rule and should be approved under section 503(c)(3) of the Bankruptcy Code.

## NOTICE

45.    The Debtors have provided notice of this Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' creditors holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (c) counsel to the agent for the Debtors' proposed postpetition financing facility; (d) counsel to the agent for the Debtors' prepetition secured credit facility; (e) counsel to the indenture trustee for the Debtors' prepetition senior secured notes; (f) the Internal Revenue Service; (g) the United States Department of Justice; and (h) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

## NO PRIOR REQUEST

46.    No prior motion for the relief requested herein has been filed in this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that this Court enter an order, substantially in the form of the proposed order attached hereto, (a) authorizing the Debtors to (i) implement the KERP and the KEIP, and (ii) make payments to related to the KERP and KEIP, and (b) granting such other and further relief as is just and proper.

Dated: April 3 2014
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*[signature]*

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Tel:   (302) 467-4400
Fax   (302) 467-4450
Email: landis@lrclaw.com
       mumford@lrclaw.com
       brown@lrclaw.com

and

Charles A. Dale III
Mackenzie L. Shea
**K&L Gates LLP**
One Lincoln Street
Boston, Massachusetts 02111
Tel:   (617) 261-3100
Fax:   (617) 261-3175
Email: chad.dale@klgates.com
       mackenzie.shea@klgates.com

*Proposed Counsel to the Debtors and Debtors-in-Possession*